STATE of Maine

v.

Paul LOVEJOY.

Supreme Judicial Court of Maine.

Argued March 11, 1985.

Decided May 24, 1985.

Gene Libby, Dist. Atty., Deborah A. Buccina (orally), Asst. Dist. Atty., Alfred, for the State; David Gregory, Alfred, of counsel.

Richard E. Valentino (orally), Saco, for defendant.

Before McKUSICK, C.J., and NICHOLS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

This case comes before us on an appeal by defendant Paul Lovejoy of Kennebunk, challenging his conviction by a York County jury of having violated 28 M.R.S.A. § 1058 (Supp.1984–1985), which prohibits the furnishing of liquor to minors. Defendant asserts two errors in the trial court as the grounds for his appeal. Finding no merit in either assertion, we affirm the judgment below.

On August 10, 1983, eighteen-year-old John Norman and two of his friends pitched tents at Picnic Rocks, a high bluff overlooking the Kennebunk River, with the intention of camping there overnight. They wanted to have a party at their campsite that evening, so they pooled their money to buy a keg of beer. They could not buy the keg themselves, however, since all were under 20 years of age. Accordingly, they went into Kennebunkport to find someone of age to buy the beer for them, and to spread the word to others about their keg party. At a Mobil gas station Norman and his friends met up with an acquaintance, David Lamper, who had passed his 20th birthday the prior December. Norman and his underaged friends enlisted Lamper to join their keg party and to obtain the beer for them with the money they had collected. During their discussions, defendant Lovejoy was also present at the Mobil station; the jury could rationally have found that defendant was standing within earshot of those discussions. At the request of either Norman or Lamper, defendant agreed to give Lamper (who had no driver's license) a ride to a store to get the keg of beer. When Lamper left the Mobil station with defendant in the latter's Chevelle, Norman and his underaged friends returned to Picnic Rocks to await the arrival of the keg. At the store Lamper accomplished the purchase of a 15-gallon keg of beer, along with a supply of plastic beer cups, and defendant moved his

car to the rear of the store to load the keg into the trunk.

Picnic Rocks is accessible only by a rough, dirt road about half a mile long that leaves the Old Port Road, nearly opposite the house of defendant's mother. With the keg of beer in the Chevelle's trunk, defendant and Lamper returned to defendant's mother's house, where earlier in the day defendant had been working on his four-wheel-drive pickup truck. It was then apparently between seven and eight o'clock in the evening. At trial there was conflicting evidence as to how the heavy beer keg was transported down the dirt road to Picnic Rocks; there was testimony that Lamper took the keg down on another friend's motorcycle, and other testimony that defendant took the keg to Picnic Rocks[1] in his truck. In any event, defendant did not go to the party at that time, but returned to working on his pickup. Sometime prior to 11:00 p.m. that same evening, Lamper reappeared at defendant's mother's house to ask defendant for a second ride into town to buy another keg of beer. Defendant once again agreed and took Lamper to two stores, the first one having run out of beer by the keg. At the second store defendant, who knew the store operator, vouched for Lamper's age and the purchase was made. Defendant then brought Lamper and the second keg back to his mother's house. As to how the second 15-gallon keg was transported down the dirt road, defendant Lovejoy himself testified that he used his four-wheel-drive pickup to carry the keg to the far end of the dirt road, after Lamper and friends allegedly trying to take the keg down the road on a 10-speed bike got stuck in a mud hole. Defendant testified that others unloaded the beer keg from his truck and carried it up the embankment to a spot near the campfire. He said that

after staying with his truck for a few minutes, he went up to the party where the second keg was already in use.

The State and defendant provide differing versions of the events that followed. At trial defendant testified that he noticed a large number of minors in attendance immediately upon his arrival at the party site, and that he left right away as a result. He testified that on his way back down to his truck, he passed several police officers going in the opposite direction, but did not speak with them. The State, through the testimony of two police officers, maintained on the contrary that when the police arrived at the party site in response to a noise complaint, defendant was standing in a group of people near the campfire, with a plastic cup of beer in his hand. The officers had also recognized defendant's truck as they approached Picnic Rocks. Most of the score or more participating in the party, in the officers' opinions, were minors. Several minors, aged at the time of the party between 14 and 18 years, testified at trial that they had drunk beer from both kegs.

## I.

■ On May 3, 1984, defendant was charged by information with assisting in the procurement of, or giving, delivering or furnishing liquor for a minor. The information failed, however, to charge that his actions were knowing, an essential element of the crime. 28 M.R.S.A. § 1058.[2] When defendant moved to dismiss the information on the ground that it failed to charge him with a crime, the State by way of response moved to amend the information by inserting the word "knowingly." At the time the jury was drawn for the case, and before either motion had been acted upon by the Superior Court, the word "knowingly" appeared in handwriting on the face of

---

1. Because of an embankment, it is not possible to see the party area at Picnic Rocks from the end of the dirt road, which is as far as defendant could have driven his truck.

2. In pertinent part, 28 M.R.S.A. § 1058 reads:

1. Offense. It is a violation of this section for any person, other than a licensee or his agent within the scope of his employment, to knowingly:

A. Procure, or in any way aid or assist in procuring, furnish, give or deliver liquor for a minor or any intoxicated person....

the information, apparently having been inserted there in the clerk's office.[3] On the following day, the court denied defendant's motion to dismiss the criminal charge and granted the State's motion to amend the information by adding the word "knowingly."

Defendant urges us to hold that the Superior Court erred in allowing the State to amend the information. The action of the court below, however, was entirely within the bounds of its authority. The strict rules relating to the amendment of an indictment, on which defendant heavily relies, do not apply to the amendment of an information. M.R.Crim.P. 7(e) succinctly states: "The court may permit an information or complaint to be amended at any time before verdict or finding if no additional or different offense is charged and if substantial rights of the defendant are not prejudiced." *See* Cluchey & Seitzinger, *Maine Criminal Practice* § 7.12(1985). Amendment of the information in the present case plainly neither prejudiced defendant's substantial rights nor charged him with an additional or different offense. The statutory reference in the information made it clear that defendant was intended to be charged with *knowing* procurement. The insertion of the word "knowingly" into the information merely made explicit what had already been implicit in the charge, and resulted in no surprise or detriment to defendant. *Cf. State v. Hathorne*, 387 A.2d 9, 13 (Me.1978) (alteration of an indictment merely made explicit what had been implicit in the charge).

Further direct authority for the Superior Court's action in so doing is to be found in M.R.Crim.P. 12(b)(5), which reads in pertinent part: "If the [defendant's] motion is based upon a defect which may be cured by amendment of the complaint or information, the court may deny the motion and order that the complaint or information be amended." That is precisely what the judge in this case did. The amendment of the information in the case at bar served to further the policy established in M.R. Crim.P. 2 that the rules "be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay." We find no error in the disposition of defendant's and the State's motions.

## II.

■ Defendant's second argument is that there was insufficient evidence presented at trial to sustain his conviction. Specifically, he argues that there was no evidence from which the jury could infer that his admitted participation in procuring and furnishing beer was with the knowledge that it was to be consumed by minors. To determine whether there was sufficient evidence adduced at trial to sustain a guilty verdict, we inquire whether, viewing all the evidence in the light most favorable to the prosecution, any trier of fact could rationally find beyond a reasonable doubt every element of the offense charged. *State v. Caouette*, 462 A.2d 1171, 1176 (Me.1983). In the present case, we are only concerned with the element of knowledge. The jury's verdict will stand if the record contains evidence to sustain a finding of defendant's knowledge as to any one of the various enumerated activities with which he was charged.[4] "A general verdict of guilty on several counts is a verdict on all, and therefore on each; .... If one count be good, judgment will not be arrested." *State v. Tibbetts*, 86 Me. 189, 190, 29 A. 979, 979 (1893).

We emphasize most strongly that it is not our function on appeal to supplant the findings of the jury. "[I]t is the *exclusive* province of the fact finder, here the jury, to decide what credence should be given to

---

**3.** The alteration of process without the specific order and authorization of the court was highly irregular and cannot be condoned.

**4.** The various possibilities are: assisting in the procurement of liquor for a minor; furnishing liquor to a minor; giving liquor to a minor; and delivering liquor to a minor. *See* 28 M.R.S.A. § 1058, quoted in pertinent part in n. 2 above.

the various witnesses and their testimony." *State v. Doughty,* 399 A.2d 1319, 1326 (Me. 1979) (emphasis added); *see State v. Hamilton,* 149 Me. 218, 240, 100 A.2d 234, 244–45 (1953). "[T]he reasonable doubt which will prevent conviction and support a motion for judgment of acquittal must be that of the jury, the trier of the facts, and not that of the appellate court." *State v. Blier,* 371 A.2d 1091, 1093 (Me.1977). Regardless whether we would have concluded, as did the jury, that defendant was guilty of the crime charged, we must strictly limit our inquiry to the question whether there was *any* evidence, sufficient to eliminate reasonable doubt, that defendant knew that one or more of the many persons engaging in the keg party were under the age of 20. We have said that the standard is "whether there was credible evidence from which the jury would be justified in believing beyond a reasonable doubt that the defendant was guilty." *State v. Doughty,* 399 A.2d at 1326. "The Law Court can vacate a guilty verdict only if the jury could not rationally have reached that conclusion on the basis of the evidence before it. . . . The standard . . . is the same whether the evidence in the case is circumstantial or direct." *State v. Caouette,* 462 A.2d at 1176 (citations omitted). Otherwise stated, jury convictions will be upheld unless *no* trier of fact could rationally find proof of guilt beyond a reasonable doubt. *State v. Crosby,* 456 A.2d 369, 370 (Me.1983). "If the result reached by the jury was rational, we have no authority to reverse." *State v. Smith,* 382 A.2d 40, 42 (Me.1978).

The evidence in the present case, though less than overwhelming, provided a basis for the jury rationally to find defendant guilty of one or more of the criminal acts with which he was charged. Under the authorities just cited, that is enough to sustain his conviction; we need not, and may not, decide whether we would have given more credence or weight than the jury did to defendant's exculpatory evidence.

5.  *See State v. Smith,* 382 A.2d 40, 42 (Me.1978).

The testimony at trial, viewed as it must be in the light most favorable to the jury's verdict,[5] established that defendant was present at the Mobil gas station when Norman asked Lamper to buy beer for him and gave him the pooled money therefor. No direct testimony was given about the relative physical locations of defendant, Lamper, and Norman at the gas station when these arrangements were made, but from the following testimony given by Lamper, the jury would have been justified in inferring that defendant was no more than a few feet away at that critical time:

Q   Mr. Lamper, when you had your original discussion with John Norman concerning the purchase of the first keg from Bennett's, Paul Lovejoy was present; wasn't he?

A   At Bennett's?

Q   When you were talking with John Norman at the Mobil station.

A   Yes.

Q   Paul Lovejoy was present?

A   Yes, but I don't know if he was listening.

From this testimony, the jury was entitled to infer that defendant was standing close enough so that he could and did hear Norman's conversation with Lamper. The jury would further have been justified in concluding, based on the following excerpt from Lamper's testimony, that the eighteen-year-old Norman himself participated in asking defendant to provide transportation to procure the first keg:

Q   Where did you leave from to buy that keg of beer?

A   The Mobil station.

Q   Did anyone leave with you?

A   Um—*we* had asked Paul to give *us* a ride to the store.

Q   Who had asked Paul?

A   I did or John. Norman did. I can't remember.

(Emphasis added)   From Lamper's entire testimony at trial, as well as his demeanor

on the stand, the jury could rationally conclude that Lamper's failure of memory on that last question stemmed from his friendship with defendant, and his desire not to make the obviously incriminating statement that the underaged Norman had directly arranged the transportation with defendant. There was also evidence from defendant himself that he knew that Norman was underage:

Q How about John Norman? Do you know John Norman?

A Yes, I know John Norman.

Q Do you know how old John Norman is?

A He is about—I'd guess 18, 19.

Q He is under 20?

A Yes.

While that testimony is phrased in terms of defendant's knowledge at the time of trial that Norman was a minor, the inference is equally available that he was also aware at the Mobil station that Norman was two years under the drinking age of 20. The jury also had the opportunity, as we do not, to view Norman's appearance and to judge how obvious to defendant Norman's age would have been. The jury could rationally have found that defendant's participation in the beer-buying trips was at the instigation of someone whom he knew to be underaged, and was therefore with the knowledge that at least one minor was going to consume some of that beer. Given the large quantity of beer involved, the jury might indeed have inferred that defendant knew that Norman was acting as the spokesman for a whole group of minors, all of whom were to drink beer from the keg.

That circumstantial proof of defendant's knowledge was sufficient so that the jury could rationally find beyond a reasonable doubt that defendant knew he was participating in the procurement of liquor for minors. *See State v. Doughty*, 399 A.2d at 1326 (circumstantial proof of belief that statements were perjurious); *State v. Beale*, 299 A.2d 921, 925 (Me.1973) (circumstantial proof of belief that received property

was stolen). To prove the *mens rea* of knowledge under 17–A M.R.S.A. § 359 (1983) (receiving stolen property), "the State need present only evidence that the appellant was aware of circumstances that would cause him to subjectively entertain the belief that the [property was] stolen." *State v. Smith*, 400 A.2d 749, 755 (Me. 1979). No reason appears why we should treat proof of knowledge under the furnishing liquor to minors statute any differently. That standard was met here, and so we must affirm defendant's conviction.

The jury's guilty verdict is also supported by evidence further tying defendant to the party at Picnic Rocks, and in fact providing a basis for the jury to conclude that he was guilty of furnishing, giving or delivering liquor to minors, as well as assisting in its procurement. Upon their return from the second trip to buy beer, defendant and Lamper were met at defendant's mother's house by a third person, whom the jury was entitled to believe was Norman. Lamper testified on cross-examination:

Q ... Didn't you drive from there back to Paul's mother's house?

A Yes.

Q With the Chevelle?

A Uh-hum.

Q At this time wasn't there a friend of yours, also, that was around where Paul's mother's house was?

A Yes.

Q Do you remember what his name was?

A John Norman. I'm not sure.

Q You're not sure who it was?

Did you and the friend take the keg out of the trunk of the Chevelle at this time?

A Yes.

The jury could have rationally believed, from that exchange, that Norman met Lamper and defendant at defendant's mother's house, and that defendant acquiesced in Norman's assisting Lamper in removing the keg from defendant's car.

Given defendant's knowledge that Norman was a minor, his acquiescence in Norman's taking the beer away with him amounted to a knowing furnishing of liquor to a minor.

More damning still to defendant was the testimony at trial regarding his participation in the party at Picnic Rocks. The jury was entitled to believe the testimony of two police officers that they saw defendant standing at the party with a plastic cup of beer in his hand, talking with some friends. That posture, if believed by the jury, was hardly consistent with the claim defendant made, that no sooner had he arrived at the party but that he noticed the presence of minors there and left. · Defendant's casual participation in the Picnic Rocks keg party, where he admitted it was obvious that minors were drinking beer, coupled with his admitted trips to the store to buy that beer, provide a strong inference that he was knowingly involved in furnishing the beer to underaged youths. In addition, defendant himself testified at trial in a way that the jury could have believed indicated his consciousness of guilt. When he was originally asked by the prosecutor if he had not had a beer cup in his hand at the party, defendant responded: "No, I had a Pepsi." Soon thereafter, he again claimed it was a can of Pepsi that he held in his hand. He specifically denied having had any beer from either of the two kegs. Within a few minutes of those denials, however, he admitted to his attorney on redirect examination and to the prosecutor on recross that in fact someone had handed him a cup of beer at the party. Defendant asserted, however, that he threw the cup down as soon as he had it in his hand because he noticed that there were minors present. His initial attempt to dissemble the fact that he had been handed a cup of beer could reasonably have been seen by the jury as evidence that he realized he had something to hide. Such an inference that a defendant is conscious of his guilt is relevant evidence and may be considered by the jury as substantive proof of the offense. *See State v. Conlogue*, 474 A.2d 167, 171 (Me.1984). The jury could ration-

ally have believed that defendant participated without protest for at least a few minutes at a party where it was obvious to him that minors were given the beer that he had helped to obtain. That fact finding, reached by the jury in the exercise of its exclusive authority to decide what testimony to believe and to draw reasonable inferences therefrom, is sufficient in itself to allow the jury to conclude that he was knowingly involved in furnishing liquor to minors. His conviction will stand.

The entry is:

Judgment affirmed.

All concurring.