STATE of Maine

v.

**Maurice E. MURPHY.**

Supreme Judicial Court of Maine.

Argued May 9, 1985.

Decided July 30, 1985.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

Defendant Maurice Murphy appeals his conviction in Superior Court (Hancock County) of murder and Class A robbery committed upon Maxine Eaton, late of Northeast Harbor, on June 11, 1982. After his indictment on those charges, defendant pleaded both' not guilty and not guilty by reason of insanity, and elected under 17–A M.R.S.A. § 40 (1983) to have a bifurcated trial. In the first stage of the trial, a jury found that the State had proved beyond a reasonable doubt all elements of the substantive offenses of murder and robbery. In the second stage, which was tried jury-waived, the trial justice found that defendant had failed to prove his insanity defense by a preponderance of the evidence.

We reject defendant's initial contentions on appeal that his constitutional right to a speedy trial was violated and that the evidence before the jury was insufficient to support its guilty verdict. We agree with defendant, however, that the trial court in the first stage of the bifurcated trial erroneously excluded the testimony of two psychologists whom defendant presented to testify regarding his capacity to have the required culpable state of mind at the time of the murder and robbery. We vacate his convictions. We also address the merits of other issues defendant raises on appeal that are likely to come up on retrial.

## I.

### The Facts

From the evidence before it during the first "guilt or innocence" stage of the trial, the jury could reasonably have found the following facts. In August of 1981, defendant Maurice Murphy's adult daughter Marsha came to stay with her parents on Maple Street in Northeast Harbor. As a State's witness, Marsha Murphy acknowledged at trial that her father had always

Charles K. Leadbetter (orally), Wayne S. Moss, William R. Stokes, Eric E. Wright, Thomas L. Goodwin, Asst. Attys. Gen., Augusta, for plaintiff.

Fenton, Chapman, Fenton, Smith & Kane, Nathaniel R. Fenton (orally), Bar Harbor, Douglas B. Chapman, Gross, Minsky, Mogul & Singal, P.A., by: George Z. Singal, Bangor, for defendant.

been a heavy drinker, but it seemed to her that in August 1981 he was drinking even more than usual. He was "sickly and crazy," so that it was "hard to talk with him, hard for him to keep a thought." Defendant would usually stay up most of the night and sleep most of the morning. His breakfast was typically a can of beer. His only food would be sandwiches, which he would eat every two or three days. He always kept the house locked up and the curtains pinned shut, because he was convinced that there were snipers waiting outside to get him. He weighed only 98 pounds, and spent most of his days watching television. He felt that the Russians and especially the Chinese "were coming to get him." Most of the time he kept a .38 caliber revolver near him for protection.

After staying with her parents for about a month, Marsha Murphy moved next door. During the fall and winter of 1981, defendant's condition became worse. Although he associated with his family, he would never wash, change his clothes, or even take them off, for months at a time. His bed and the chair he usually occupied in the darkened living room were always soaked with urine.

By the spring of 1982, defendant's condition had so deteriorated that he entered the hospital. There, his mental condition was worse than ever: he hardly knew where he was, and he felt sure that "they" were switching around the pictures on the walls surreptitiously. He thought he was a prisoner of war. His condition had not improved when he was released from the hospital a week later. His speech at that time was limited to disconnected, "crazy little statements." He would sit around all day in his recliner in the living room, with the curtains pinned shut "against the snipers," sipping beer, in a sort of stupor. He seldom left the house.

During Friday evening, June 11, 1982, defendant, as he later told his daughter, did leave his house, taking with him his .38 caliber pistol. He walked two doors down Maple Street and entered the home where 56-year-old Maxine Eaton lived alone. He asked Miss Eaton to lend him some money, on the pretext that his granddaughter needed an operation. She got out her large pocketbook and subsequently began to cry, for no reason that was apparent at trial. Defendant, believing her to be desperately unhappy, took it upon himself to "play God."

On Sunday, June 13, Maxine Eaton's body was found in the hallway of her house, shot once through the heart at close range.[1] Police investigators retrieved the fatal bullet, which was Speer brand .38 caliber ammunition, from a doorframe in her house. Defendant without ever being asked to do so voluntarily turned his pistol over to the police. A forensic ballistics examiner testified, on the basis of his laboratory testing conducted with that gun and the bullet found in the victim's home, that the projectile could only have been fired from defendant's gun. A box of Speer brand "hollowpoint"-type bullets[2] was found in defendant's house. It could not be ascertained whether the projectile fired in the victim's house was a hollowpoint bullet.

A thorough search of Miss Eaton's house failed to turn up the large pocketbook she invariably carried. On June 18, police observed defendant sitting in his car in a parking lot by the Northeast Harbor waterfront, with a pile of papers under the car on the passenger side. When defendant moved his car to another space in the lot some 20 feet away, a police officer in plainclothes walked over and collected those papers. They turned out to include bank books and a checkbook belonging to Maxine Eaton, as well as various other personal papers, some of which also bore her name.

---

1. Expert testimony established that the shot was *fired at least* 6 to 8 inches, but no more than 2 to 3 feet, from the victim's chest.

2. Hollowpoint bullets are so designated because some of the lead is drilled out of the projectile along its longitudinal axis.

On June 19, more of the victim's papers were recovered, partially burned, from an old dump where defendant had been seen a few days earlier. Finally, still more of the victim's papers were found intermingled with defendant's possessions in a paper bag next to the chair in his living room where defendant was sitting when he was arrested on June 18, 1982.

At arraignment defendant entered pleas of not guilty and not guilty by reason of insanity to the charges that he had murdered and robbed Maxine Eaton. He was then required by 17–A M.R.S.A. § 40 to elect between a unitary trial, at which the issues of guilt and insanity would be tried together, and a two-stage proceeding, in the first stage of which only his guilt or innocence would be determined, and in the second stage of which, if he was found guilty in the first stage, his criminal responsibility or lack thereof due to insanity would be adjudged. Defendant exercised his right under the statute not to inform the jury of the bifurcated nature of the proceedings. In the first stage of the trial, before the jury, the State had the burden of proving all elements of the crimes of murder and robbery beyond a reasonable doubt. The jury found that the State successfully carried that burden and convicted defendant of both crimes. Defendant then elected to have the insanity issue tried in the second stage by the court without a jury as provided in 17–A M.R.S.A. § 40(3). Defendant in that second stage had the burden of proving by a preponderance of the evidence his lack of criminal responsibility because of a mental disease or defect. 17–A M.R.S.A. §§ 39(1), 40(4) (1983). The trial justice found that he had not met that standard of proof, and so held him criminally responsible for his acts in murdering and robbing Maxine Eaton.

## II.

### Defendant's Right to a Speedy Trial

Defendant at the outset contends that pretrial delays caused by the State deprived him of his right to a speedy trial under Me. Const. art. I, § 6 and U.S. Const. amend. VI, XIV, and that the charges against him must therefore be dismissed with prejudice. *See Strunk v. United States*, 412 U.S. 434, 440, 93 S.Ct. 2260, 2263, 37 L.Ed.2d 56 (1973). We reject defendant's contention.

■ Whether an accused has been denied his right to a speedy trial can be determined only through the use of a delicate balancing test that takes into account all of the circumstances of the case at hand. *See State v. Cadman*, 476 A.2d 1148 (Me.1984). In *Barker v. Wingo*, 407 U.S. 514, 530–33, 92 S.Ct. 2182, 2191–94, 33 L.Ed.2d 101 (1972), the Supreme Court identified four factors to be considered in evaluating an alleged denial of the right to a speedy trial: the length of the delay, the reasons for the delay, the defendant's assertion of his right, and prejudice to the defendant arising out of the delay. In a number of cases we have used the balancing test of *Barker v. Wingo* under both our state and federal constitutions. *See, e.g., State v. Smith*, 400 A.2d 749 (Me. 1979).

### A. Length of the Delay

■ We have held that "[t]he *Barker* analysis ... need be undertaken only when the length of delay is so presumptively prejudicial as to warrant consideration of the three remaining factors." *State v. Dudley*, 433 A.2d 711, 713 (Me.1981). In the case at bar, a total period of 25 months and 3 weeks expired between defendant's arrest and the commencement of his trial. While that length of time is not unusually egregious, *see State v. Smith*, 400 A.2d at 752 (25-month delay), and cases cited therein, here, as in *Smith*, we find that it does generate a presumption of sufficient prejudice to necessitate the *Barker* analysis. However, a period of 25 months' delay "is not so inordinate as to require a per se finding of a denial of a speedy trial." *Id.* at 753.

### B. *Reasons for the Delay*

Of the 25-plus months between defendant's arrest on June 18, 1982, and the commencement of his trial on August 9, 1984, 5½ months resulted from defendant's motions and count against his claim of a denial of the right to a speedy trial. *Id.* Three months of delay are attributable to the State's difficulties in scheduling, at various times, hearings in the case. A further period of 8½ months immediately preceding trial, during which defendant does not contend that inadequate progress was made in bringing him to trial, was spent in resolving multifarious matters, including a considerable number of motions filed by defendant.

■ The major controversy on the speedy trial question involves the question of who, the State or defendant, was responsible for a delay of some 8½ months following the entry of an order granting a defense motion for an independent psychological evaluation of defendant to determine his competency to be arraigned, and requiring the State to provide to the defense psychologists all of its medical records relative to Murphy's mental condition. Following that order, some examination of defendant by his own psychologist took place within about two months, but neither the court nor the State was made aware of it for another 6½ months. During that time, the defense was apparently waiting for compliance by the State with the court order requiring disclosure of its medical records so that the defense evaluation could be completed. The defense took no steps during that period to secure compliance by the State with the court order. It never approached Bangor Mental Health Institute, where the records were held, about releasing them. Finally, over eight months after the order for a mental examination of defendant, the defense filed a motion to dismiss the case for denial of the right to a speedy trial. Between the date that motion was filed and the day set for its hearing, defendant received all the State's medical records pertaining to him.

The justice who heard the motion found that the delay was attributable to the failure of *both* the State and defendant to take reasonable steps to ensure that defendant's records were provided to him. We cannot say that that finding was clearly erroneous. *See Harmon v. Emerson,* 425 A.2d 978, 981 (Me.1981).

■ In looking at the various reasons for the delay that occurred in this case, we note that there is a complete absence of any of the undesirable motivations for delay toward which the speedy trial guarantee is especially directed. *See Barker v. Wingo,* 407 U.S. at 531 & n. 32, 92 S.Ct. at 2192 & n. 32; *State v. Smith,* 400 A.2d at 753. When, as here, the reasons for delay in prosecuting a criminal matter are innocent of any invidious intention to deprive a defendant of his liberty unfairly, the delay will weigh less heavily in favor of a claim of denial of the right to a speedy trial. *See Barker v. Wingo,* 407 U.S. at 531, 92 S.Ct. at 2192.

### C. *Defendant's Assertion of his Right*

■ The Superior Court justice who heard defendant's motion to dismiss noted that defendant utterly failed to assert his right to a speedy trial at any time prior to his filing of that motion on June 28, 1983, over a year after his arrest. Even then, defendant requested the court not to hear his motion until "after September 5." It is unlikely that the delay to which defendant objects would in large part have occurred, had he been more assertive of his right of discovery from the State. While it is true that defendant has no obligation to bring himself to trial, his failure to assert his right to a speedy trial at any time prior to his motion to dismiss makes it less credible that the delay was undue or that defendant suffered any prejudice therefrom. *Id.* at 531–32, 92 S.Ct. at 2192–93.

### D. *Prejudice to Defendant*

Perhaps most important in the present case is the absence of any showing of prejudice to defendant. No defense evidence

was unavailable at trial due to the lapse of time since the murder-robbery. Defendant's own mental condition has apparently improved in the intervening time, as a result of the extensive medical attention he has received. The delay involved in his case may thus have worked to his advantage, by allowing him to be more alert and better able to participate in his own defense than he otherwise might have been.

■ Our analysis of the four *Barker v. Wingo* factors in the present case leads us to the firm conviction that defendant's right to a speedy trial has not been violated. The only factor that would tend to indicate the contrary is the bare length of the delay, which in this case is not so long that it alone entitles defendant to any relief. While there was obviously some neglect of the case by the prosecutor's office, that neglect was not of constitutional dimension, particularly considering defendant's concurrent inattention to the case. We find, in sum, nothing in the present set of circumstances that would entitle defendant to the drastic remedy of dismissal of the charges against him.

■ Defendant also argues that the procedural history of his prosecution supports three additional, but related, grounds for dismissal: unnecessary delay under M.R.Crim.P. 48(b); denial of constitutional due process; and delay by the State in providing discovery under M.R.Crim.P. 16. We reject those arguments. Criminal Rule 48(b) vests the decision whether to dismiss for unnecessary delay in bringing a defendant to trial, along with whether such a dismissal is to be with prejudice, in the sound discretion of the Superior Court justice hearing the motion. *See State v. Brann*, 292 A.2d 173, 176–77 (Me.1972); *cf. State v. Wells*, 443 A.2d 60, 64 (Me.1982) (M.D.C.Crim.R. 48(b)). The hearing justice in the case at bar refused to dismiss on that ground, and we are not shown anything to prove that he exceeded his allowable discretion by that decision. Exactly the same reasoning leads us to reject defendant's argument that he was entitled to

a dismissal with prejudice under M.R. Crim.P. 16(d), as a sanction against the State for its delay in complying with a discovery order. *See State v. Davis*, 483 A.2d 740, 742 (Me.1984) (sanction for discovery violation committed to sound discretion of trial judge). Nor are we shown anything in the procedural history of this case that unfairly prejudiced defendant and thus denied him his due process rights.

### III.
### *Sufficiency of the Evidence before the Jury*

Aside from the trial errors that defendant contends occurred in the course of the first stage of the Superior Court trial, which if established would require at most a new trial, he asserts that in some particulars the evidence before the jury was legally insufficient to support his conviction. He therefore asks to be acquitted. *See State v. S.\*\*\* G.\*\*\**, 438 A.2d 256, 258 (Me.1981). Our review of the record, however, shows ample evidence to sustain the jury's finding of guilt.

The two aspects of the State's proof that defendant challenges as insufficient are the evidence of his state of mind at the time of the murder and robbery, and that of the value of the stolen property. For each of those two elements of the State's proof, we make the inquiry whether, viewing the evidence in the light most favorable to the prosecution, any trier of fact rationally could find that element of the offense beyond a reasonable doubt. *State v. Lovejoy*, 493 A.2d 1035, 1037 (Me.1985).

■ The State's evidence relevant to defendant's intent on the night of the crimes is as follows. A friend of defendant's family testified at trial that she and his daughter Marsha visited him after his arrest. He confessed to his daughter at that time that he thought that Maxine Eaton was so terribly unhappy that he had "just played God." The fact that the victim was shot at very close range, and the further fact that the bullet passed directly through her heart, furnish an additional strong inference that the murder was in-

tentional. Other evidence in the case, including the theft of the victim's pocketbook and the attempted destruction of some of her personal papers at an old dump, is also suggestive of purposeful activity, particularly with regard to the robbery, and serves to corroborate defendant's admission that he "played God." The entire evidence was sufficient to justify the jury's finding beyond a reasonable doubt that defendant intended to kill and rob Maxine Eaton.

■ Similarly, there was sufficient evidence to support a finding of the other element of the robbery charge that defendant argues was missing from the State's case; namely, proof that the property taken had some value. For the theft element of robbery as defined in 17–A M.R.S.A. § 651(1)(D) (1983), the accused must have exercised unauthorized control over "property," which is defined as "anything of value." *Id.*, §§ 353(1), 352(1). Suffice it here to note that Miss Eaton's savings account passbooks, found in a parking lot under defendant's car with him sitting in it, fall within the definition of "anything of value" set forth in section 352(1)(D), as expressly including "[w]ritten instruments . . . representing or embodying rights concerning . . . personal property. . . ."

## IV.

### *Exclusion of Expert Testimony of State of Mind*

■ We turn now to the exclusion of certain evidence proffered by the defense in the first stage of the bifurcated trial. That evidence, in the form of testimony by two psychologists, sought to show that because of an abnormal condition of his mind on the night and in the circumstances of the alleged crimes, defendant was unable to form, or have, the culpable intent or knowledge requisite for conviction of either crime. Defense counsel made an offer of proof of the psychologists' testimony, following the procedure we prescribed for that purpose in *State v. Burnham*, 406 A.2d 889, 895 (Me.1979). The sort of evidence sought to be introduced by the defense in its offer of proof is prone to create difficulties at trial because of the somewhat subtle and elusive distinction, in practice, between evidence regarding a defendant's mental state that is admissible in the first "guilt or innocence" stage of a bifurcated trial, and similar evidence that must be held in reserve for the second "insanity" stage. In drawing that distinction, it is important to bear in mind the difference between evidence of an abnormal state of mind introduced under 17–A M.R.S.A. § 38 (1983), for the purpose of raising a doubt about a defendant's culpable state of mind,[3] and evidence of a mental disease or defect introduced under 17–A M.R.S.A. § 39 (1983), for the purpose of showing a lack of criminal responsibility.[4] Although the evidence used for those two purposes may overlap,[5] it is clear that only evidence relevant to the question of guilt or innocence is appropriate in the first stage of a

---

**3.** 17–A M.R.S.A. § 38 provides:
 Evidence of an abnormal condition of the mind may raise a reasonable doubt as to the existence of a required culpable state of mind.

**4.** 17–A M.R.S.A. § 39 provides:
 1. A defendant is not criminally responsible if, at the time of the criminal conduct, as a result of mental disease or defect, he either lacked substantial capacity to conform his conduct to the requirements of the law, or lacked substantial capacity to appreciate the wrongfulness of his conduct. The defendant shall have the burden of proving, by a preponderance of the evidence, that he lacks criminal responsibility as described in this subsection.

**2.** As used in this section, "mental disease or defect" means any abnormal condition of the mind which substantially affects mental or emotional processes and substantially impairs the processes and capacity of a person to control his actions. An abnormality manifested only by repeated criminal conduct or excessive use of alcohol, drugs or similar substances, in and of itself, does not constitute a mental disease or defect.

**5.** Neither is the evidence usable for the two purposes necessarily the same. It is possible to intend the consequences of an act without appreciating the wrongfulness of those consequences. *See State v. Mishne*, 427 A.2d 450, 454 (Me.1981). As our Criminal Code recognizes,

bifurcated trial, and that evidence relevant alone to the insanity defense cannot be introduced until the second stage. The critical factor in determining whether a defendant's proof may be admitted in the first stage of his trial is thus the relevance of the evidence to the issue framed in section 38, regardless of the relevance of that evidence on the issue framed in section 39.

 Our inquiry in the case at bar, where admissibility under section 38 is at issue, is thus limited to the question whether the proffered testimony of two psychologists "would tend to generate a reasonable doubt as to [defendant's culpable] state of mind." *State v. Mishne*, 427 A.2d 450, 456 (Me.1981). Otherwise stated, the proffered testimony, to be admissible, must tend to *negate* the conclusion that defendant had a culpable state of mind. *See State v. Burnham*, 406 A.2d at 896. If the evidence offered by defendant did not tend to negate the mental element of the crimes charged, it was properly excluded by the presiding justice. Conversely, if it did tend to create doubt on the question of defendant's culpable mental state on the evening of June 11, 1982, then its exclusion was error. Analysis of the proffered testimony reveals that it did indeed have a tendency to negate defendant's intent or knowledge and should not have been excluded.

The defense's offer of proof elicited from two psychologists, Dr. Dannel H. Starbird and Dr. Elizabeth A. McMahon, testimony regarding defendant's mental condition in June of 1982. Starbird gave his opinion that defendant was living in a psychotic state on June 11, 1982, and that the subject

matter central to his psychosis involved violence and the use of guns. Starbird clearly stated that he did not believe that defendant could have formed the intent to go to the victim's house, shoot her at close range, take her purse, and attempt several days later to destroy the contents of the purse, because those actions would be too closely related to the central themes of defendant's psychosis for him to "know what he was doing." Starbird testified further that in activity central to defendant's psychosis, defendant would not be aware of the implications or the results of his behavior.

McMahon was also of the opinion that defendant was psychotic and would have been reacting in a paranoid manner in any confrontation, especially with a woman, and particularly so if the woman was unfamiliar to him, as Miss Eaton was. She gave her opinion that there was a very high probability that defendant would not have been able to form a conscious intention in such a situation when he was armed with a loaded gun. She also gave her opinion that he would not be aware of the fatal consequences of his conduct in those circumstances. Those two opinions directly address defendant's ability to murder and rob Miss Eaton "intentionally" or "knowingly," as those culpable mental states are defined in 17–A M.R.S.A. § 35(1) & (2) (1983). Furthermore, the psychologists' testimony was of a nature and in a form to meet the requirements for admissibility set forth in *State v. Flick*, 425 A.2d 167, 170–71 (Me. 1981).[6]

however, some evidence may be relevant to *both* determinations and so is admissible in both parts of the bifurcated trial. *See* 17–A M.R.S.A. § 40(4).

6. In *State v. Flick*, 425 A.2d 167, 170–71 (Me. 1981), we noted that a medical professional is not by that status made competent to testify to *legal* conclusions, and that "opinions which are arguably within the expert's specialized knowledge, but which are so conclusory, or so framed in terms of the legal conclusions to be drawn, that they will not 'assist the trier of fact' (M.R. Evid. 702) or will pose a danger of confusing

the jury which outweighs their probative value (M.R.Evid. 403) or if there is an insufficient factual basis to support the conclusions (M.R. Evid. 705(b))," may be excluded. *Id.* at 171. The psychologists' testimony on voir dire in the case at bar avoided those pitfalls: it was firmly based on extensive observation and testing of defendant; it posed little danger of confusing a jury; it was given in ordinary layman's terms rather than solely in the words of the statute; and the reasoning underlying the opinions was fully explored.

The proposed testimony of the two psychologists in this case stands in marked contrast to evidence we have previously held was properly excluded, as not tending to raise a reasonable doubt as to culpable mental state, in *Mishne*, 427 A.2d at 455, and in *State v. Sommer*, 409 A.2d 666, 669 (Me.1979). In *Sommer*, the evidence of an abnormal condition of mind, which came exclusively from lay witnesses, was not specifically connected to the defendant's ability to act with intent or knowledge in the circumstances of the crime. *Id.* at 669–70. The evidence sought to be introduced in that case did not show any relationship between the defendant's general mental condition and his ability to function intentionally or knowingly in specific criminal activity. In *Mishne*, psychiatric and other expert medical testimony was proffered to show that the defendant there at the time of the crime was in withdrawal from drug addiction, and as a result suffered from a compulsion to obtain drugs. We held that "evidence of a compelling need tends to *confirm* the conclusion that defendant acted with awareness [in stealing drugs] and with the conscious object of fulfilling that need." *Mishne*, 427 A.2d at 455 (emphasis added). Thus in that case the defense evidence did not tend to *negate* intent or knowledge as required by *Burnham;* rather, it had the contrary tendency and so it was not admissible under section 38.

In the case at bar, on the other hand, the defense produced two experts, both of whom had administered a variety of personality and intelligence tests to defendant Murphy and had extensively interviewed him and his family. Having formed expert opinions that defendant was suffering from a lack of contact with reality, those experts took the essential further step of evaluating the effect of defendant's psychotic state on his ability to have the culpable intent or knowledge requisite to convict him for murder and robbery in this case. Both psychologists stated their opinion that, because of his psychosis and the specific circumstances of the crime, it was *unlikely* that defendant would have been able to intend or know the consequences of his acts of shooting and robbing Miss Eaton. Those psychologists linked defendant's bizarre behavior to his likely state of mind at the time of the crimes, and their expert opinions tended to show that that state of mind was not culpable. It was the absence of any such linkup in *Sommer*, and the failure of that link to negate a culpable mental state in *Mishne*, that made inadmissible the evidence of abnormal mental condition proffered in the first stages of those trials.

The psychologists' testimony was directly relevant to showing defendant lacked a culpable state of mind at the time of the murder-robbery. It is not for us to decide how much weight or credence is properly to be accorded that testimony. That determination falls within the exclusive factfinding province of the jury. *See State v. Lovejoy*, 493 A.2d at 1037. Nor is it for us to decide whether, in light of all the other evidence that defendant had the requisite intent or knowledge, the expert opinions of Drs. Starbird and McMahon would in fact raise a reasonable doubt in a factfinder's mind as to that element of the offense. That determination also is up to the jury. *Id.* at 1037. Since the psychologists' opinions tended to refute the existence of the culpable mental state that the State was required to prove in the "guilt or innocence" stage of the trial, the jury was entitled to hear that evidence.

Considering that the question of culpable intent or knowledge was the most hotly contested issue at trial, we cannot say that it was highly probable that the exclusion of the psychologists' opinion testimony did not affect the jury's verdict. We conclude therefore that the error was not harmless. *See State v. True*, 438 A.2d 460, 467 (Me. 1981).

## V.

### Other Alleged Trial Errors

On the usual criminal appeal where a new trial is necessary, we forego examina-

tion of the appellant's other claims of error and simply remand to the trial court. Here, however, several of the issues raised on the present appeal are almost certain to recur upon retrial, and thus it promotes judicial economy for us to address them now, to afford guidance to counsel and to the court on retrial. *See Kimball v. State*, 490 A.2d 653, 659 (Me.1985).

### A. *Miranda Question.*

 We first address the admissibility in evidence of a statement defendant made, shortly after his arrest, to Detective Shuman of the State Police. Defendant contends that his statement was taken in violation of his right to have an attorney present during custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). That issue was raised by motion before trial and was disposed of at a suppression hearing on May 3, 1984. Detective Shuman testified at that hearing on direct examination regarding the right-to-counsel portion of the *Miranda* warnings:

A. ... I said, you have an absolute right to a lawyer before questioning and the presence of a lawyer with you during questioning. Do you understand that? I got the answer from Mr. Murphy that he understood and I was insulting him and I did not have to ask him those questions. He understood he could have a lawyer if he wanted one and if he couldn't afford one he did not have to answer any questions without one. I went on, if you cannot afford a lawyer one will be furnished free for you before any questioning if you desire. I asked if he understood that and his answer was that he understood that if he could not afford one one would be obtained for him. On the back of the Miranda I asked the two waiver questions. If he understood each of the rights I gave him and he said yes and I said having these rights in mind do you wish to talk to us now without a

lawyer present and he said, sure, he would talk to us. No problem.

Q. Then you proceeded to conduct an interview with him?

A. Yes, I did.

At the probable cause hearing some two years earlier, the detective had also testified:

I continued on that, "If you cannot afford a lawyer, one will be furnished to you free before any questioning, if you desire." I asked him if he understood that. He—his response was, "Yes." He said, "I don't need a court-appointed lawyer; I'm gonna get one." I said, "Do you understand what that last line meant?" And he said, "Yes; that if I can't afford one, one will be furnished."

At the suppression hearing, Shuman affirmed the accuracy of his earlier testimony. The suppression justice found that defendant's statement was taken during a custodial interrogation following defendant's voluntary waiver of his right to have an attorney present. That determination must be allowed to stand if there is evidence in the record that rationally supports it. *State v. Schueler*, 488 A.2d 481, 484 (Me.1985). The preceding quotations from the record make clear that defendant understood his right to an attorney and agreed to speak to the police without his lawyer being present. His comment that he was "gonna get" his own attorney was given in the context of the question whether he needed to have counsel appointed for him. At no time did he ever express a *present* desire to have the assistance of counsel. The suppression justice was correct in refusing to suppress defendant's post-arrest statement.

### B. *Validity of Search Warrant*

The next issue we address is defendant's contention that the fruits of a search made of his house were improperly admitted at trial because the warrant under which the search was conducted was invalid. The reason he assigns for the warrant's invalid-

ity is that the complaint justice who issued the warrant was appointed to that office in violation of Me. Const. art. III, § 2, and art. VI, § 5, and that he therefore had no authority to issue the search warrant.

In January 1979, the magistrate in question had taken office as Judge of Probate in Hancock County. In March of that same year he was also appointed a complaint justice by the Chief Judge of the District Court. He held both offices at the time he issued the warrant to search defendant's house. Defendant argues that the appointment of a sitting judge of probate to the office of complaint justice violated the prohibition in Me. Const. art. VI, § 5 against a judge's holding another office.

■■■ We have no occasion to reach the question whether a judge of probate may be validly appointed a complaint justice. The capacity in which the magistrate acted when he issued the warrant in this case was that of justice of the peace,[7] a post he also held, and not that of complaint justice. 4 M.R.S.A. § 161 (1979) provides:

> The Chief Judge of the District Court may authorize any attorney-at-law, who is duly licensed to practice law in the State of Maine who is also a justice of the peace, to receive complaints and ... to issue search warrants....
>
> *Any complaint so received or process so issued shall be in his capacity as a justice of the peace.*

(Emphasis added) The prohibition in the Maine Constitution against a judge's holding another office specifically exempts from that restriction the office of justice of the peace:

> No Justice of the Supreme Judicial Court or any other court shall hold office under the United States or any other state, nor under this State, *except as justice of the peace* or as member of the Judicial Council.

Me. Const. art. VI, § 5 (emphasis added). It therefore matters not, for the validity of the search warrant in the case at bar, whether the issuing justice of the peace was validly appointed a complaint justice. No defect in his appointment as a justice of the peace appears of record, and none is even suggested by defense counsel. We will therefore assume that his appointment to that office was both regular and valid. The sole attack made by the defense upon the validity of the search warrant is thus without foundation.

### C. *Admission of Papers Found at the "Merchant's Pit" Dump.*

■■■ At trial, the presiding justice admitted in evidence certain of the victim's personal papers, and other items such as might be found in a woman's handbag, that had been recovered in a partially burned condition from a dump known as "Merchant's Pit," at a remote location in the woods outside Northeast Harbor. Defendant asserts that their admission on the question of his culpability of the murder-robbery was error,[8] first, because the evidence did not connect those exhibits in any way to him. The record does not support that contention. The police found the exhibits at the dump as the result of the report by a 15-year-old boy who had seen defendant at that remote location. Defendant's second argument, that the Merchant's Pit exhibits even if relevant should have been excluded under Evidence Rule 403, is equally unpersuasive. We fail to see how their admission could have resulted in any unfair prejudice to defendant, let alone unfair prejudice that substantially outweighs their obvious probative value. The exhibits were not such as might inflame the minds

---

7. In Maine justices of the peace traditionally have been empowered to issue search warrants. *See, e.g.,* P.L.1821, ch. 148, § 16; ch. 149, § 6.

8. The defense sought at trial a limiting instruction that the exhibits could be used only to *establish* that a murder and robbery had taken place and could not be used as evidence that it was defendant who committed the crimes. On appeal defendant puts in issue only the necessity for such a limiting instruction. It therefore suffices, for the present purposes of aiding in the retrial, that we address the relevance of the exhibits to defendant's guilt.

of the jurors, or otherwise distract them from their duty. There was no error in admitting the Merchant's Pit exhibits.

### D. *Testimony Regarding Hollowpoint Bullets.*

The last question that we consider has to do with the reason why defendant voluntarily gave his gun to the police a few days after the murder, without ever being asked to do so. The State at trial sought to prove a motive for the surrender of defendant's weapon that would be inculpatory rather than exculpatory. It produced testimony that defendant had repeatedly told his daughter's boyfriend that he believed that hollowpoint bullets could not be traced to any particular gun. The State also provided an expert witness who testified that the spent bullet found in the victim's house must have been fired from defendant's gun and, although it was so damaged that he could not tell if it was a hollowpoint bullet, it was perfectly consistent in weight and configuration with the hollowpoint bullets found in defendant's house.

 Defendant argues that the testimony of both the boyfriend and the expert should have been excluded at trial as irrelevant. He says that hollowpoint bullets cannot be connected either to himself or to the murder, and that therefore any testimony concerning them or his belief about them is not relevant to any issue in the case. Again, the record does not support defendant's contention. A State Police detective discovered a partial box of .38 caliber bullets in defendant's home. He thought that there were nine bullets in the box. He gave the box to the State's ballistics expert, who produced it at trial and identified the bullets as being of the hollowpoint variety. It was thus established that defendant had hollowpoint bullets in his house. The fact that at trial the box turned out to contain ten rather than nine bullets shows merely that someone made a mistake in counting, and does not affect the fact that the bullets that were there were found in defendant's house and fitted his gun. The

ballistics expert's testimony was relevant to the question whether the bullet that killed Maxine Eaton was a hollowpoint bullet that had come from the box in defendant's house. The hollowpoint bullets were thus connected both to defendant and to the scene of the crime. The Superior Court did not err in admitting the challenged testimony relating to them.

The entry is:

Judgment vacated.

Remanded for further proceedings consistent with the opinion herein.

All concurring.