STATE of Maine

v.

Theodore RIPPY.

Supreme Judicial Court of Maine.

Argued Feb. 4, 1993.
Decided May 28, 1993.

R. Christopher Almy (orally), Dist. Atty., C. Daniel Wood, Law Student Intern, Bangor, for State.

Charles Hodsdon (orally), Bangor, for defendant.

Before WATHEN, C.J., and GLASSMAN, CLIFFORD, COLLINS and RUDMAN, JJ.

COLLINS, Justice.

Theodore Rippy appeals from the judgment entered on his conviction of gross sexual misconduct, 17-A M.R.S.A. § 253 (Supp.1982),[1] following a jury trial in the Superior Court (Penobscot County, *Beaulieu, J.*). Rippy asserts that the trial court erred in determining the competency of the three child victims and that he was denied due process by the State's preindictment and postindictment delay. Because we find the trial court erred in its competency determinations, we vacate the judgment.

In July 1983, the Department of Human Services removed the three alleged child victims, Jane Doe, Sarah Roe, and John Roe[2] from their home because of physical abuse by their mother as well as general neglect. Rippy was the stepfather of Jane and the father of Sarah and John. Soon after entering foster care, Jane disclosed to her foster mother that Rippy had sexually abused her.

The grand jury indicted Rippy on June 1, 1987 on five counts: (I–III) gross sexual misconduct (for alleged sexual assaults on Jane, Sarah, and John, respectively); (IV) unlawful sexual contact (for alleged sexual contact with John); and (V) aggravated assault (for allegedly causing bodily injury to Sarah).[3] Rippy did not appear for ar-

---

**1.** At the time of the alleged assault 17-A M.R.S.A. § 253 read:

A person is guilty of gross sexual misconduct ... [i]f he engages in a sexual act with another person, not his spouse, and ... [t]he other person has not in fact attained his 14th birthday.

17-A M.R.S.A. § 253 (Supp.1982).

**2.** The names of the alleged victims have been changed in this opinion to protect their privacy.

**3.** The State dismissed Count V when it was discovered that, despite Sarah's assertion that Rippy cut her toes with a knife, the scars on Sarah's toes were in fact the result of corrective surgery.

raignment and a warrant for his arrest was issued. Rippy was not arrested until 1989 in Philadelphia, Pennsylvania. Rippy's first jury trial ended in a mistrial because newly-discovered Department of Human Services (DHS) records were not disclosed to Rippy until the morning of trial. Rippy's second jury trial began on January 22, 1991.

At a pretrial hearing, the trial court, without conducting a *voir dire*, held that as a matter of law the younger two children, Sarah and John, were incompetent to testify. The trial court held a *voir dire* immediately prior to trial to determine whether the oldest of the three children, Jane, was competent to testify and determined that she was competent. At the trial, Jane testified that Rippy forced her to engage in vaginal, anal, and oral intercourse when she was four years old while Sarah and John, then ages 32 and 22 months respectively, watched. Jane also testified that she observed Rippy engaging in oral and vaginal intercourse with Sarah and oral sex with John. At the close of the State's evidence, the trial court granted Rippy's motion to dismiss Count IV. The jury returned verdicts of guilty on Count I and not guilty on Counts II and III.

## I.

### Competency of Child Witnesses

The indictment charges that the alleged sexual assaults occurred in April 1983 when Jane was four years old. At the time of trial, Jane was 11 years old. Dr. Bruce Saunders, a clinical psychologist, testified, outside the presence of the jury, that when he interviewed Jane in August 1983, he concluded that she was functioning at a mental age of about two and one-half years.[4] Saunders also testified that he thought Jane would be a poor informant at that time because "[h]er level of intellect was such that she did not understand much of what was going on." Dr. Saunders further testified that clinical psychologists working with children generally accept that, in order for an individual to be able to store events in the individual's memory and then recall and repeat the events accurately, even in response to questions calling for a "yes" or "no" response, a level of language ability must be present. He also testified that Jane did not possess this level of language ability when he examined her after the occurrence of the alleged events.[5]

After its own questioning of Jane on *voir dire*, the trial court initially concluded:

> The child, based on the Court's inquiry, is not at this time able to satisfy this Court of an ability to remember and communicate activities that took place prior to [July 1983]. Her description of her present status ... is easily communicated ... [but] I believe the law requires that I have to evaluate her ability to competently testify as to matters as alleged in this particular instance that took place in 1983. I'm not satisfied that she can competently testify as to matters that took place in 1988 or '89.

The trial court, however, then allowed the State to directly examine the witness. During the State's examination, Jane described the alleged assault in detail; for example, the assault allegedly occurred upstairs on a soft bed while her mother was getting groceries. On the conclusion of the State's questioning, the trial court resumed its own *voir dire*. Jane again remembered virtually nothing of her life at the time of the alleged assault. For example, she did

---

4. As an example of Jane's mental capacity at that time, Saunders recalled one particular incident as follows:

> When [Jane] was asked how many noses she had, she pointed to her nose. When I said, that's a good girl and restated the question, she said green. And I observed that whenever she wasn't sure of a question, clearly didn't know the answer or whenever she could either read that I was going to seek another answer from her, she said green in response to my questions.

5. Dr. Saunders described Jane's language abilities at that time as follows:

> She would [at times] speak in appropriate cadence and with appropriate tone, but would be saying nothing. It would be childish jabber ... She would start a sentence, go into this jabber and that would be the thought she was communicating to you, which, of course, was not a thought. It was just a mimic of people ... talking.

not remember attending a day-care center nearly every day for over a year prior to being placed in foster care or even who lived with her at the time of the incident. Defense counsel did not question Jane at the *voir dire.*

The trial court recognized that the issue was governed by M.R.Evid. 601 [6] and stated:

> I'm accepting Dr. Saunder's testimony as to the status of the proposed witness some several years ago. And based on his testimony, the Court would conclude at that time she would be incompetent as a witness....
>
> \* \* \* \* \* \*
>
> The Court's concern is whether or not she understands, not so much the necessity of [telling] the truth, but whether she has a reasonable ability to remember what did occur.... The Court is satisfied that her ability to remember obviously isn't present. However, her response is truthful when she says she doesn't remember. And the court is focusing on that for the purpose of determining her credibility....
>
> \* \* \* \* \* \*
>
> For the limited purpose [of determining] whether or not she qualifies as a witness at this stage, I'm going to rule she qualifies.

Rippy argues that this decision was clearly erroneous because Jane lacked any reasonable ability to remember the events of 1983

and, therefore, she should have been disqualified pursuant to M.R.Evid. 601(b)(4). We agree.

■ "A court's decision regarding a child's competency to testify is a factual one and is reviewed for clear error." *State v. Mazerolle,* 614 A.2d 68, 71 (Me.1992). The competency of a witness is governed by M.R.Evid. 601 which requires a proposed witness have a reasonable ability to remember the matter about which she is to testify.[7] M.R.Evid. 601(b)(4).

■ The evidence does not support a finding that Jane had a reasonable ability to recall, in 1991, events that occurred in 1983. She was unable to recall even basic aspects of her life as it was in 1983 other than the detailed description of the events of the one day on which she was allegedly assaulted by Rippy. We find, therefore, that the trial court committed clear error in finding Jane a competent witness. Because Jane's testimony was central to the State's case, we cannot say it was not highly probable that it did not affect the judgment. *See State v. True,* 438 A.2d 460, 467 (Me.1981).

■ Because the issue might arise again if there is a new trial, we address Rippy's contention that the trial court committed an error of law by deciding, without any *voir dire,* that the younger two victims, Sarah and John, were incompetent witnesses as a matter of law. According to the

---

6. Rule 601 reads:
   (a) **General Rule of Competency.** Every person is competent to be a witness except as otherwise provided in these rules.
   (b) **Disqualification of Witness.** A person is disqualified to be a witness if the court finds that (1) the proposed witness is incapable of expressing himself concerning the matter so as to be understood by the judge and jury either directly or through interpretation by one who can understand him, (2) the proposed witness is incapable of understanding the duty of a witness to tell the truth, (3) the proposed witness lacked any reasonable ability to perceive the matter or (4) *the proposed witness lacks any reasonable ability to remember the matter....*
   M.R.Evid. 601 (emphasis added).

7. Rule 601(b) was amended effective April 16, 1990 to add two potential disqualifications:

   *(3) the proposed witness lacked any reasonable ability to perceive the matter or*
   *(4) the proposed witness lacks any reasonable ability to remember the matter.*
   Me.Rptr., 563–575 A.2d CI (emphasis in original). The advisory committee's note to this amendment states:
   > Certainly perception and memory are vital to a witness' ability to bear testimony. These abilities or lack of them are often the subject matter of attacks on witness credibility. The rule as amended will screen out a witness who had no reasonable ability to perceive facts and reliably remember them. It is not intended to permit the trial judge to rule on the credibility of a witness in advance by not permitting the witness to testify.
   M.R.Evid. 601 advisory committee's note to 1990 amend., Mr.Rptr., 563–575 A.2d CIII.

indictment the alleged sexual assaults occurred in April 1983 when Sarah and John were ages 32 months and 22 months, respectively. At the time of trial, Sarah was 10 years old and John was 9 years old. While the case was pending, Sarah and John moved with their adoptive parents to Louisiana. After a pretrial hearing to determine whether to bring these two children back to Maine at the State's expense, the trial court held, "*[a]s a matter of law, the two children age 1 and age 2 are not competent witnesses of the events alleged in the indictment.*" (Emphasis added).

■ We find the trial court committed an error of law by deciding, as a matter of law, that Sarah and John were not competent to testify. As mentioned above, determining whether a child is competent to testify is not a question of law but is a factual determination. *See State v. Mazerolle*, 614 A.2d at 71. Furthermore, " 'a child of *any age* is competent to be a witness unless disqualified.' " *Id.* (quoting *State v. Hussey*, 521 A.2d 278, 280 (Me. 1987)) (emphasis added). However improbable it might seem that children under the age of three at the time of the alleged assault would be competent to testify, it is not possible to rule out this competency as a matter of law. In fact, we have upheld a trial court's finding that a child who was three years old at the time of the trial was competent to testify. *See State v. Hussey*, 521 A.2d at 279–81. It certainly does not follow that a child who was 32 months old at the time of the alleged assault and ten years old at the time of trial is precluded from testifying as a matter of law.

■ Although Jane testified that Sarah and John were eye witnesses to her alleged assault, DHS records state that Sarah had completely recanted her allegations of abuse. Because these witnesses, if found competent, were the only alleged eye witnesses to the incident, and because there is some evidence that they may have denied ever witnessing the assault on Jane, this error cannot be considered harmless.

II.

*Preindictment Delay*

■ Although the alleged conduct occurred in April 1983, the indictment was not returned until June 1987. Rippy argues that the State's preindictment delay constituted a denial of due process and that the trial court's denial of his June 1990 motion to dismiss was, therefore, reversible error. We disagree.

■ "The primary guarantee against a citizen being subjected to overly stale criminal charges is provided by statutes of limitations." *State v. Cyr*, 588 A.2d 753, 756 (Me.1991). The due process clauses of the Maine and United States Constitutions play a more limited role in protecting defendants from oppressive preindictment delay. *Id.* When deciding due process challenges for preindictment delay, we apply the standard articulated by the United States Supreme Court in *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). *State v. Cyr*, 588 A.2d at 756. Under that standard, the defendant must first demonstrate "actual and unjustifiable prejudice" resulting from the delay. *State v. Cyr*, 588 A.2d at 756; *see also State v. Berkley*, 567 A.2d 915, 917 (Me.1989) (quoting *State v. Hutchins*, 433 A.2d 419, 423 (Me.1981)). Only then do we inquire as to the reasons for the delay offered by the State and determine, whether, on balance, the delay remains unjustified. *State v. Cyr*, 588 A.2d at 756.

Rippy argues that he was prejudiced by the State's delay because by the time his case got to trial, he was unable to find several witnesses including the victims' mother. Rippy did not explain, however, how the testimony of the victims' mother would have aided the defense had she been willing to testify. The testimony of the remaining witnesses allegedly "lost" because of the delay was either cumulative or speculative. Rippy, therefore, failed to establish that he was prejudiced by the preindictment delay. Because of Rippy's failure to establish prejudice resulting from the delay, we need not address whether the delay was, on balance, unjustifiable.

## III.

### Postindictment Delay

■ Rippy argues that the State's failure to disclose discovery information in violation of M.R.Crim.P. 16(b) caused a 19–month pretrial delay and thus denied him the right to a speedy trial. Me. Const. art. I § 6. A 19–month delay does not establish a *per se* violation of Rippy's right to a speedy trial. *See State v. Michaud,* 590 A.2d 538, 540 (Me.1991) (32–month delay is not a per se violation of defendant's right to a speedy trial). It is, however, enough to raise the presumption that such delay is unnecessary. *See State v. McLaughlin,* 567 A.2d 82, 83 (Me.1989) (17 and one-half month delay also raises presumption). Once that presumption is raised, we apply the balance required by *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to determine whether a due process violation existed. *State v. Joubert,* 603 A.2d 861, 863 (Me.1992). The *Barker* test is a " 'delicate balancing test that takes into account all of the circumstances of the case at hand.' " *Id.* (quoting *State v. Murphy,* 496 A.2d 623, 627 (Me.1985)). The *Barker* Court identified four factors that should be considered: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant caused by the delay. *State v. Murphy,* 496 A.2d at 627.

First, the 19–month delay in the case at bar can be attributed to the fault of both parties. Rippy filed at least six continuances that were entirely unrelated to the alleged discovery violations on the part of the State. Second, although Rippy did assert his right to a speedy trial, he did so only after 13 months has passed since arraignment (and after five continuances were granted on his behalf). Rippy's second jury trial was held six months after he asserted his right to a speedy trial and could have been held earlier had Rippy not moved for additional continuances. Third, as we discussed above, Rippy failed to show any substantial prejudice from the delay. Considering all of the circumstances of this case, we find no violation of Rippy's constitutional right to a speedy trial.

■ Rippy further contends that he was deprived of due process because of the 17–month delay in furnishing trial transcripts to be used by this court on appeal. Although the deadline for filing transcripts with this court was March 18, 1991, the court reporter did not submit the transcripts to the court until August 17, 1992. Although we have not previously addressed this issue, the First Circuit Court of Appeals has held:

> An excessive delay in furnishing a pretrial or trial transcript to be used on appeal or for post-conviction relief can amount to a deprivation of due process.

*United States v. Pratt,* 645 F.2d 89, 91 (1st Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981) (nine-month delay not enough to deprive defendant of due process); and *Layne v. Gunter,* 559 F.2d 850, 851 (1st Cir.1977) (delay of nearly three years was found to be a due process violation). Although a 17–month wait for a trial transcript is unfortunate, it does not constitute a denial of due process.

Rippy raises a number of other contentions none of which merit discussion.

The entry is:

Judgment vacated. Remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.