STATE of Maine

v.

Linwood P. REEVES.

Supreme Judicial Court of Maine.

Argued Sept. 5, 1985.

Decided Oct. 4, 1985.

Gene Libby, Dist. Atty., David D. Gregory (orally), Alfred, for plaintiff.

Bourque, Clegg & Kugler, Kenneth R. Clegg (orally), Sanford, for defendant.

Before McKUSICK, C.J., and ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

McKUSICK, Chief Justice.

After a jury trial the Superior Court (York County) convicted defendant Linwood P. Reeves of one count of burglary, 17–A M.R.S.A. § 401 (1983), a Class .B crime; one count of kidnapping, 17–A M.R.S.A. § 301 (1983), a Class B crime;[1] and one count of rape, 17–A M.R.S.A. § 252 (1983), a Class A crime. On appeal, we find no merit in any of defendant's numerous claims of reversible error at trial, and we therefore affirm his conviction on all three counts.

At about midnight on the rainy night of October 12, 1983, in South Berwick, the nine-year-old victim was taken from her bed by a male intruder. The man put her in his car, drove to a spot in the woods two miles from her home, and raped her in the back seat of the car. The man released the victim about a half mile from her home and drove off. Later that night, in the course of her statement to the police, the victim said that her assailant looked like the fa-

1. Defendant was indicted for Class A kidnapping, but on the basis of the evidence at trial the presiding justice reduced that charge to Class B kidnapping pursuant to 17–A M.R.S.A. § 301(3) (1983).

ther of an eight-year-old girlfriend of hers, known as "Bobbie" Reeves, the daughter of defendant.

The next afternoon defendant's mother called police and reported defendant to be missing. He had come home at around 1:00 a.m. the night before and had acted strangely. He had taken a rifle and walked out into the woods. The police officer responding to the missing-person call remembered that defendant's name had come up in the course of the rape investigation. He obtained permission from defendant's wife to search defendant's car. He found red blood-like stains on the back seat. Thereafter, police obtained a search warrant for the car. The search uncovered incriminating evidence, including the impression on the inside of the windshield of a partial palm print matching that of the victim. After about 30 hours in the woods, defendant returned home and was promptly arrested. Defendant pleaded both not guilty and not guilty by reason of insanity. At trial, he relied almost exclusively upon the insanity defense, contending that he was not criminally responsible for the charged offenses because he suffered from dissociative episodes and could not control his impulses.

## I. *Motion to Suppress Evidence*

Defendant contends that the justice who heard his pretrial suppression motion erred in refusing to exclude evidence seized in the search of defendant's automobile pursuant to a search warrant. Defendant alleges that the affidavit on which the search warrant was based contained material misstatements and omissions made by the affiant police officer intentionally or with reckless disregard for the truth. If defendant is correct in his allegation, then the affidavit must be stricken, the search warrant voided, and the fruits of the search suppressed to the same extent as if probable cause was lacking on the face of the affidavit. *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *State v. Rand*, 430 A.2d 808, 821 (Me.1981). At the suppression hearing the burden was on defendant to prove by a preponderance of the evidence that the affiant acted intentionally or with reckless disregard for the truth. *Rand*, 430 A.2d at 821.

At the pretrial hearing defendant alleged that the police officer making the affidavit must have known that the victim could not identify her assailant and that he intentionally omitted that fact from the affidavit. He further alleged that there was a discrepancy between the description of defendant's automobile, including its color, and the description given by the victim of her assailant's automobile and that this was not pointed out in the affidavit. Finally, defendant alleged that a critical discrepancy existed between the typewritten summary of the victim's police interview that was attached to the affidavit and the original handwritten report of that interview. The typewritten summary contained a statement by the victim that her assailant "looked like" defendant, but no such statement appeared in the original handwritten report from the interview. The suppression justice heard testimony on those issues and concluded that defendant had failed to prove by a preponderance of the evidence that the alleged omissions and misstatements were made intentionally or with reckless disregard for the truth.

■■■ The decision of the suppression justice must stand unless "clearly erroneous." *Id.* A finding of fact is not clearly erroneous if there is *any* competent evidence in the record to support it. *State v. Harriman*, 467 A.2d 745, 747 (Me.1983). "Due regard is accorded the trial court to judge the credibility of witnesses." *Id.* Applying that deferential standard of review, we cannot see any clear error in the justice's finding that any misstatements or omissions in the affidavit were not made intentionally or with reckless disregard for the truth. The affiant police officer testified that he was unaware at the time of his affidavit that the victim had said she was unable to make a positive identification of her assailant. The victim's description of

her assailant's automobile was attached to the affidavit, contradicting defendant's allegation that the affiant intended to hide the fact that the victim had described a car of a different color than that of defendant's automobile. Finally, the police interviewer testified that defendant's name was not written down in the original handwritten report of the victim's interview because at that time the victim's statement was thought important only for the purpose of conveying the victim's general description of her assailant, not for the purpose of positively identifying defendant. It was only later, when other evidence tied defendant to the crime, that the statement gained significance for the purpose of identifying the victim's assailant. Since there is competent evidence to support the findings of the suppression justice, the search warrant was valid and the fruits of the search of defendant's car were admissible.

## II. *Motion for Discovery Sanctions*

Defendant's next contention on appeal is that the presiding justice erred by refusing to grant an M.R.Crim.P. 16(d) sanction of dismissal of the charges against defendant on the ground of alleged State violations of court-ordered discovery.

Whether to impose a sanction for violating the discovery rules rests within the discretion of the presiding justice. *State v. Davis*, 483 A.2d 740, 742 (Me.1984). M.R.Crim.P. 16(d) provides that the presiding justice "may take appropriate action" to remedy a violation. The primary test for the appropriateness of such action is whether the remedy would be in the furtherance of justice. *State v. Landry*, 459 A.2d 175, 177 (Me.1983). To establish an abuse of discretion under Rule 16(d) is a difficult task. To do so, an appellant must show that he was in fact prejudiced by the discovery violation despite the court's effort to nullify or minimize its consequences, *Landry*, 459 A.2d at 177; 1 Cluchey & Seitzinger, *Maine Criminal Practice* § 16.6 (1985), and that the prejudice rose to the level of depriving him of a fair

trial. *State v. Sapiel*, 432 A.2d 1262, 1268 (Me.1981). The extreme sanction of dismissal should be reserved for extreme cases. M.R.Crim.P. 16 advisory committee's note to 1978 amend., *reprinted in* 1 Cluchey & Seitzinger, at 16–9.

In the case at bar, the refusal to impose the extreme sanction of dismissal was well within the discretion of the presiding justice. Before ruling on defendant's motion, the presiding justice carefully reviewed one-by-one the entire list of alleged discovery violations by the State. In some instances the justice gave relief to defendant. For example, certain material was ordered turned over to defendant, and other evidence, including the entire testimony of one of the State's witnesses, was excluded from the trial. We are not persuaded that defendant was prejudiced at all by the denial of his motion for the extreme sanction of dismissal. Significantly, he never requested a continuance or any lesser sanction than dismissal.

## III. *The Testimony of James Lindahl*

In his next point on appeal, defendant attacks the admission in evidence of the testimony of one James Lindahl. Defendant asserts that the presiding justice should have stricken Lindahl's testimony because the State failed to have Lindahl specifically identify defendant as the driver with whom Lindahl hitchhiked a ride on the night of the crime. Without that specific identification, defendant contends, Lindahl's testimony is irrelevant and therefore inadmissible under M.R.Evid. 402.

At trial Lindahl testified that during the fall of 1983 he had hitchhiked on Route 9 between his girlfriend's home in Berwick and his home in North Berwick between three and five times a week. He would visit his girlfriend in the evening and leave her house at around 9:00 p.m., hitchhiking back to North Berwick. Lindahl never was able to testify that he had been hitchhiking on the specific date of October 12, 1983. He did testify that when a police officer contacted him during the winter of 1984

and asked if Lindahl had been hitchhiking on a mid-October night, he had replied affirmatively.

When asked about a particular October night, Lindahl testified that he remembered hitchhiking on a night when it was raining relatively hard. He had left his girlfriend's house at the usual time and started walking on Route 9 toward North Berwick. He walked some four or five miles before he got a ride. He testified that at around 10:20 p.m. he was picked up within two miles of Wick's service station by the driver of a small to mid-sized car. The driver was alone. Lindahl described the driver as a male Caucasian with dark hair, medium build, and average to six feet in height. He testified that the man was drinking beer and complained of a headache. Lindahl gave him two Tylenol tablets. He rode in the car for two or three miles; then the driver dropped him off on Portland Street in North Berwick. Lindahl testified that the driver appeared intoxicated and that he expressed great interest in sex. Lindahl's testimony was offered to show defendant's state of mind in the hours preceding the alleged rape. His testimony was important to the State's case in rebutting defendant's insanity defense.

The description of the driver given by Lindahl fitted defendant. The description of the car was reasonably close; defendant was driving a mid-sized car. There was heavy rainfall on the night of October 12, 1983, as the victim and others testified. There was testimony that defendant had left the home of some friends, across the street from Wick's garage, at around 10:30 or 11:00 p.m. In addition, a key identifying factor was brought out in testimony that defendant, in an interview with police, had stated that a hitchhiker he had picked up on the night of the rape had given defendant a pill that the hitchhiker had represented to be Tylenol.

■ The issue is whether, given these connecting pieces of evidence, Lindahl's testimony is relevant to show defendant's state of mind at the time of the crime. His testimony was relevant only if Lindahl was in fact the hitchhiker picked up by defendant on the night of October 12, 1983. Thus, it is an example of conditionally relevant evidence, which under M.R.Evid. 104(b) the court shall admit "upon the introduction of evidence sufficient to support a finding that the condition has been fulfilled." *See* Field & Murray, *Maine Evidence* § 104.3 (1976); 21 C. Wright & K. Graham, *Federal Practice and Procedure* § 5054, at 268–69 (1977). On the basis of the evidence summarized above, a jury could reasonably find that Lindahl was the hitchhiker that defendant had picked up on the critical October night of 1983. Therefore, the presiding justice did not err by allowing Lindahl's testimony to stand.

## IV. *The Videotaped Interview*

Defendant argues that his fifth amendment right against self-incrimination was violated when the presiding justice ordered the defense to permit the attorneys for the State to view a videotaped interview with defendant in advance of the time that tape was introduced in evidence by the defense. The videotape recorded an interview that Dr. John Bishop, a clinical psychologist employed by defendant, conducted with defendant during the latter's commitment at Augusta Mental Health Institute (AMHI) following his arrest. During the interview defendant admitted the rape and revealed facts tending to show that his wife, Pamela Reeves, had concealed her knowledge of the rape from the police and had hidden incriminating evidence.

Early in the trial the defense sought an *in limine* ruling that defendant could introduce the tape as a demonstrative aid to Dr. Bishop's testimony concerning defendant's mental state, but at the same time the defense asked to be relieved from the necessity of complying with a discovery order entered previously under M.R.Crim.P. 16A(c), (d) requiring advance disclosure of expert reports and tangible evidence that defendant intended to introduce at trial. Defense counsel at all times declared an

intent to place the videotape in evidence as relevant to the insanity defense. The State objected to the admission of the videotape. In order to enable the attorneys for the State to address fully the question of the admissibility of the tape, the presiding justice ordered that they be permitted to view the videotape, without the presence of the state's psychiatric experts, after the State had rested its case-in-chief. At that time, defense counsel stated that he had "no problems" with that arrangement. After viewing the tape, the State sought immunity for defendant's wife.[2] Defendant now argues that the State's use of information gained from the videotape prior to the time defendant had actually presented it in evidence violated defendant's fifth amendment rights. We disagree.

This situation is analogous to that in *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970). There, the Supreme Court addressed the issue whether a Florida notice-of-alibi rule violated the defendant's fifth amendment right against self-incrimination. The Florida rule required the defendant to give pretrial notice to the prosecution whenever the defendant planned to present an alibi defense at trial. In holding that the notice-of-alibi rule did not violate the defendant's privilege against self-incrimination, the Court explained:

> At most, the rule only compelled petitioner to accelerate the timing of his disclosure, forcing him to divulge at an earlier date information that the petitioner from the beginning planned to divulge at trial....
>
> Petitioner concedes that absent the notice-of-alibi rule the Constitution would raise no bar to the court's granting the State a continuance at trial on the

ground of surprise as soon as the alibi witness is called. Nor would there be self-incrimination problems if, during that continuance, the State was permitted to do precisely what it did here prior to trial: take the deposition of the witness and find rebuttal evidence. But if so utilizing a continuance is permissible under the Fifth and Fourteenth Amendments, then surely the same result may be accomplished through pretrial discovery, as it was here, avoiding the necessity of a disrupted trial.

*Williams*, 399 U.S. at 85–86, 90 S.Ct. at 1898 (footnotes omitted).

The same logic applies to the case at bar. At the time the State's attorneys viewed the videotape, the State had rested and defendant was pressing the presiding justice to permit him to show the videotape to the jury as part of his case-in-chief. Since defendant did in fact offer the videotape in evidence, the viewing by the State merely accelerated by a few days at most the State's discovery of its contents. There is no reason to believe that the State would not have had time to grant immunity to Pamela Reeves after the tape was shown to the jury by defense counsel. Once defendant had himself disclosed the videotape as a part of his insanity defense case, any complaint that he might otherwise have had under the fifth amendment evaporated.[3]

### V. *Prosecutorial Misconduct*

Next, defendant seeks reversal of his conviction on the ground of alleged prosecutorial misconduct. We have carefully reviewed each of the incidents referred to by defendant, but find only three worthy of discussion.

---

**2.** The State also served a subpoena duces tecum on the technician who ran the videotape equipment during the interview. However, since that person was never called to testify at trial, that subpoena raises no issue requiring our consideration.

**3.** Defendant does not make any claim of violation of the counterpart provison of the Maine

Constitution, art. I, § 6. He does add contentions that his sixth amendment right to counsel and his lawyer-client privilege under M.R.Evid. 502(b)(2) were violated by the State's early discovery of the videotape. His sixth amendment and Rule 502(b)(2) arguments, however, suffer from the same fatal defect as his fifth amendment argument.

### A. *The State's opening statement*

■ Although defendant made no objection at trial, he now contends that the assistant district attorney who made the State's opening intentionally misrepresented the expected evidence to show that defendant had raped the victim twice. Defendant sees himself prejudiced by the "two rape" statement because it made it appear more probable that he had deliberately attacked the victim and less probable that the act was a product of insanity. Although defendant was charged with one rape, the evidence technically supports the commission of two rapes. Without objection, the victim testified that her assailant entered her twice. Maine law defines sexual intercourse as *"any penetration of the female sex organ by the male sex organ."* 17–A M.R.S.A. § 251(1)(B) (1983) (emphasis added). In any event, if any error did exist, that unsaved error did not rise to the level of obviousness and high prejudice that requires the reversal of defendant's conviction. *See State v. True*, 438 A.2d at 468. No objective reader of this record could conclude that the prosecutor's statement, if error at all, was "so highly prejudicial and so taint[ed] the proceeding as virtually to deprive the aggrieved party of a fair trial." *Id.*

### B. *The victim's out-of-court identification of defendant.*

Defendant alleges that the State intentionally arranged to have the victim identify defendant in a manner that violated defendant's fourteenth amendment right to due process.

Prior to the morning she was scheduled to testify, the victim had never been asked to make an identification of defendant. She arrived at the courthouse early that morning and met with the assistant district attorney to review her testimony. The assistant district attorney told the victim that as she walked around the courthouse she might see the man who had raped her. If she did see the man, the victim was to let the assistant district attorney know. When the victim returned from breakfast, she informed the assistant district attorney that she had seen the man in the hallway. The man she identified was defendant.

The presiding justice immediately held an evidentiary hearing to determine whether the identification violated defendant's fourteenth amendment right to due process. The presiding justice found that defendant had failed to prove by a preponderance of the evidence that the identification was unduly suggestive. *See State v. True*, 464 A.2d 946, 950 (Me.1983). Thus, the court never reached the second step of the analysis described in *State v. Cefalo*, 396 A.2d 233, 240 (Me.1979), "namely, [to] determin[e] whether the reliability of that identification or any subsequent identification outweighs the corrupting effect of the suggestive procedure." Instead, the presiding justice termed this incident a "chance encounter" and refused to suppress any subsequent in-court identification by the victim based on this out-of-court identification.

■ In reviewing the presiding justice's denial of the motion to suppress, we are required to give great deference to his findings of historical fact and to accept those findings unless clearly erroneous. The legal conclusions drawn by the presiding justice, however, are subject to the independent examination and judgment of this court. *State v. Commeau*, 438 A.2d 454, 457 (Me.1981).

■ In a federal case arising here in Maine, *United States v. Hensel*, 699 F.2d 18 (1st Cir.), *cert. denied*, 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1317 (1983), an out-of-court identification involved a fact situation almost identical to the one we have here. In *Hensel*, the prosecutors told the witness to look around the halls of the courthouse in Portland to see if he could pick out the defendants. He saw them later in the courthouse snack bar. That out-of-court identification was held not unduly suggestive because there was no evidence that it occurred as a result of a confrontation prearranged by the prosecu-

tion. *Hensel,* 699 F.2d at 40. Similarly, in the case at bar, there is ample evidence to support the presiding justice's finding that this incident was a "chance encounter." There is no evidence that this identification was orchestrated by the State. The presiding justice properly refused to suppress the victim's in-court identification of defendant.

### C. *The State's closing argument*

■ Defendant asserts that the district attorney was guilty of prosecutorial misconduct during closing argument because he there treated defendant's videotaped interview by Dr. Bishop as substantive evidence. The presiding justice had ruled that the interview was to be treated as a demonstrative aid only. During closing argument the district attorney told the jury that he did not need to repeat all the evidence that had been offered to prove that defendant had committed the rape, since defendant had admitted on the videotape that he had done the deed. Defendant made a timely objection to that part of the State's closing argument.

We agree that the presiding justice erred by failing to instruct the jury to ignore that portion of the State's argument. Such error, however, was harmless. M.R.Crim.P. 52(a). The jury had heard overwhelming evidence establishing that defendant committed the rape. At trial, the principal issue was the insanity defense. On this record we are convinced that the district attorney's reference to the videotape made no difference in the end result of the trial. *See State v. True,* 438 A.2d at 467 (saved error should be treated as harmless if the appellate court believes it highly probable that the error did not affect the judgment). Although we strongly disapprove of the prosecution's disregard of the limitation the presiding justice had put on use of the videotape as evidence, vacation of defendant's conviction would be a totally inappropriate sanction in the present circumstances. ■

### VI. *Motion for New Trial*

■ After verdict, defendant made a timely motion for a new trial, which the presiding justice in due course denied. On this appeal from the judgment of conviction, we will review the legal correctness of that denial. *See* M.R.Crim.P. 37(c); *Kimball v. State,* 490 A.2d 653, 658 (Me.1985). We have already considered and found meritless all of the grounds asserted by defendant to support his motion, with a single exception; namely, defendant's allegation that "the evidence does not support the verdict." As to that ground, review of the record convinces us that the jury had before it ample evidence to justify its finding beyond a reasonable doubt that defendant was guilty of the crimes charged. The Superior Court properly denied the motion for a new trial.

The entry is:

Judgment affirmed.

All concurring.