**STATE of Maine**

**v.**

**Philip WILLOUGHBY.**

Supreme Judicial Court of Maine.

Argued March 3, 1986.

Decided April 9, 1986.

James E. Tierney, Atty. Gen., Wayne S. Moss (orally), Charles K. Leadbetter, Asst. Attys. Gen., Augusta, for plaintiff.

Bourget & Bourget, Ronald W. Bourget (orally), Augusta, Paul D. Mathews, Gardiner, for defendant.

Before NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN and SCOLNIK, JJ.

SCOLNIK, Justice.

The defendant, Philip Willoughby, appeals from a judgment entered on a jury verdict in the Superior Court (Kennebec County) convicting him of murder, 17–A M.R.S.A. § 201(1)(A) (1983), kidnapping (Class A), 17–A M.R.S.A. § 301(1)(A)(5) (1983), robbery (Class A), 17–A M.R.S.A. § 651(1)(C) (1983), and aggravated assault (Class B), 17–A M.R.S.A. § 208(1)(B) (1983). On appeal, he contends that 1) the trial justice erred in excluding certain expert testimony; 2) his right to a speedy trial was denied; 3) the motion justice erred in quashing a subpoena ad testificandum; 4)

the prosecutor misrepresented the testimony of a potential witness; and 5) the trial justice erred in admitting David Willoughby's allegedly perjured testimony. We affirm the judgment.

On December 3, 1983, Paula Roberts was kidnapped from the Summer Haven Ice Cream, Inc. shop in Augusta and was subsequently found dead. On January 26, 1984, Philip and his step-brother David Willoughby were indicted for her murder and kidnapping, the robbery of Summer Haven Ice Cream, and aggravated assault on a store customer. After Philip appeared and entered a plea of not guilty, he was committed to Kennebec County Jail because of his inability to furnish bail.

On February 3, 1984, Philip Willoughby, pursuant to Rule 14 of the Maine Rules of Criminal Procedure, filed a motion, later granted, for a separate trial from that of co-defendant David Willoughby. On February 22, the defense requested an extension of time for filing pretrial motions. The court then ordered that such motions be filed by April 2. The defendant filed a number of pretrial motions including those to dismiss various counts of the indictment, requests for funds for expert witnesses and a private investigator and for extension of time for filing motions regarding laboratory tests. On June 28, the court ordered that the trial of David Willoughby commence on October 1, 1984 and that Philip Willoughby be tried on November 5, 1984.

The trial of David Willoughby began on October 3. On October 11, the jury returned a verdict of not guilty on all counts. After David's acquittal, a different assistant attorney general was named as chief prosecutor for Philip's trial. Philip served a subpoena ad testificandum upon the prosecutor in David's trial for the purpose of obtaining at Philip's trial the prosecutor's testimony regarding certain statements he had allegedly made about David. After hearing on November 1, the court granted the State's motion to quash the subpoena.

On November 5, jury selection commenced in the trial of Philip Willoughby. On November 7, before the jury was sworn, the court, over defendant's objection, held a hearing on motions filed by Robert Willoughby (Philip's step-father), Rita Willoughby (Philip's mother), and Stacie Willoughby (Philip's sister), to quash trial subpoenas and to dismiss a material witness complaint, or alternatively, for a protective order. Upon questioning, Robert, Rita and Stacie Willoughby asserted that a family privilege precluded them from furnishing testimony that was adverse to Philip. The court denied the motions, finding no basis in Maine law for a family privilege and held Robert, Rita and Stacie in contempt of court for failure to testify to matters that were not "communications" when so directed by the court, and ordered each witness jailed pending the outcome of the trial. That same day, Robert, Rita and Stacie filed notices of appeal to the Law Court. On November 8, the court granted the State's motion to continue the trial pending disposition of the appeal. That motion alleged that the three Willoughbys were "material and essential witnesses to the State's case." The defendant then filed a motion to dismiss on the ground that he was denied a speedy trial.

On February 25, 1985, we vacated the contempt commitments of Robert, Rita and Stacie Willoughby and dismissed their appeals. *In re Willoughby*, 487 A.2d 636 (Me.1985). On March 1, the court granted the defendant's motion for the appointment at state expense of a psychologist to examine the defendant. Thereafter, Dr. Brian Rines conducted an examination of Philip. During the month of March, the defendant filed several motions, including those for additional funds for a private investigator and a motion in limine to exclude the testimony of David Willoughby.

Jury selection for the trial commenced April 1. That same day, the State moved in limine to exclude the testimony of Dr. Brian Rines. The motion was granted on

April 3 following an offer of proof. At a hearing in chambers on April 2, the parties discussed the defendant's motion in limine to exclude David Willoughby's testimony. The prosecutor stated that he was aware of evidence that would impeach David's testimony in three areas. The next day the court ruled preliminarily that David's testimony would be excluded. On April 4, as a result of the testimony elicited in voir dire examination of David and witnesses presented by the defense at a hearing held in the absence of the jury, the court reversed its preliminary ruling and allowed David Willoughby to testify. On April 13, the jury returned a verdict of guilty on all four counts. This appeal followed.

## I. *Exclusion of Dr. Rines' Testimony*

■ The defendant contends that the justice who heard the in limine motion erred in excluding as inadmissible character evidence the testimony proffered by clinical psychologist, Dr. Brian Rines, about the defendant's tendency to "puff up" or exaggerate his participation in the crimes involving Paula Roberts. The issue arises because the defendant, while incarcerated prior to his trial, made to his fellow inmates several incriminating statements that were received in evidence. We agree that the presiding justice erred in excluding the expert medical testimony as character evidence offered to impeach the validity of extra-judicial statements of the defendant but conclude that the defendant was not thereby prejudiced.

The defendant's offer of proof elicited from Dr. Rines his diagnosis that the defendant had a classifiable personality disorder. In Dr. Rines' opinion, Philip made statements describing sexual abuse of the corpse in order to exaggerate the importance of his involvement in these crimes and to "puff up" or enhance his or others' views of him.

Relying upon *State v. Arnold*, 421 A.2d 932 (Me.1980), the trial justice excluded Dr. Rines' expert opinion as "psychological testimony offered to impeach the truthfulness" of the defendant. However, a comparison of the nature of the proffered testimony in *Arnold* with that in the case before us reveals that this reliance was misplaced. In *Arnold*, the psychologist sought to testify solely about the defendant's character for truthfulness. We held there that because the evidence proffered by the defendant was not "reputation" evidence of his character for truthfulness, it was inadmissible under Rule 405(a) of the Maine Rules of Evidence, which provides the exclusive method of proving a trait of character.[1]

Here, the proffered testimony was not merely "a generalized description of [the defendant's] disposition in respect to a general trait, such as honesty," *State v. Conlogue*, 474 A.2d 167, 172 (Me.1984) (quoting Field & Murray, *Maine Evidence*, § 406.1, at 75 (1976)), but was medical testimony concerning a "puffing syndrome," which, like the expert testimony of the battered child syndrome in *Conlogue*, "cannot fairly be called 'character evidence' within the meaning of the rule." *State v. Conlogue*, 474 A.2d at 172; *cf. State v. Anaya*, 438 A.2d 892 (Me.1981) (battered wife syndrome).[2] Just as a description of the battered child syndrome would have allowed

1. M.R.Evid. 405(a) provides:
    (a) **Reputation.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

2. We note as we did in *State v. Murphy*, 496 A.2d 623, 631 n. 6 (Me.1985) that the nature and form of the psychologist's testimony here met the requirements for admissibility set forth in

*State v. Flick*, 425 A.2d 167 (Me.1981). We stated in *Flick* that a medical expert is not competent to testify to *legal* conclusions, and that conclusory opinions, or those so framed in terms of legal considerations that they will not assist or will confuse a trier of fact, may be excluded. *Id.* at 170–71. Dr. Rines' testimony, like that in *Murphy*, was based on observation and testing of the defendant; it was given in layman's terms, so as not to be confusing; and the basis for the opinion was fully explained.

the jury in *Conlogue* to weigh the credibility of a witness's confession and subsequent retraction, so would a description of the puffing syndrome related to Philip's personality disorder have allowed the jury here to assess the credibility of his incriminating declarations to fellow jail inmates. The defendant has "'wide latitude' to present all evidence relevant to his defense, unhampered by piecemeal rulings on evidence.'" *State v. Conlogue*, 474 A.2d at 172 (citation omitted). Philip was therefore entitled to show the "[c]ircumstances tending to lessen the probative effect" of his admissions. Field & Murray § 801.5, at 193. Accordingly, Dr. Rines' testimony should have been admitted.

■ Although the justice erred in excluding this testimony, we conclude that such error was harmless. M.R.Crim.P. 52(a). We are persuaded that on this record, exclusion of the expert testimony made no difference to the end result of the trial. *See State v. Reeves*, 499 A.2d 130, 137 (Me.1985); *State v. Rytky*, 476 A.2d 1152, 1155 (Me.1984) (refusal to admit evidence of victim's reputation in community for truth, though error, was harmless when it was highly improbable error affected judgment in the case); *State v. True*, 438 A.2d 460, 467 (Me.1981).

It is undisputed that the statements made by the defendant to the inmates were incriminating. However, at least five of the inmates who testified at trial agreed that there is a "pecking order" in jail that leads the inmates to "puff up," brag or make untrue statements about their crimes to impress the "tough guys" or the "bosses." Moreover, some of the inmates testified about the different and at times inconsistent stories Philip told. Philip Willoughby himself testified about the "pecking order" that "goes by crimes." He said he tried to get into the "little cliques" by bragging about his crime and "saying anything they wanted to hear."

Accordingly, we conclude that Dr. Rines' testimony concerning the "puffing syndrome" was cumulative to that of the defendant and inmates. Furthermore, that the defendant may have exaggerated particularly the sexual details of his involvement in the crime does not change the fact that he admitted the commission of the crime. Had the jurors heard testimony about Philip's tendency to exaggerate from this expert witness, it is still highly probable that their judgment would have been the same. The defendant therefore takes nothing on his first argument on appeal.

## II. *The Defendant's Right to a Speedy Trial*

The defendant contends he was denied the right to a speedy trial guaranteed under both Maine Constitution article I, section 6 and United States Constitution amendments VI and XIV, by the trial court's continuance of his trial, at the State's request, pending this court's disposition of the appeals of Robert, Rita and Stacie Willoughby from their judgments of contempt. We reject the defendant's contention.

We recently recognized that whether an accused has been deprived of his right to a speedy trial "can be determined only through the use of a delicate balancing test that takes into account all of the circumstances of the case at hand." *State v. Murphy*, 496 A.2d 623, 627 (Me.1985); *see State v. Cadman*, 476 A.2d 1148 (Me.1984). In *Murphy* we listed the four factors to be considered in the balancing test under both our state and federal constitutions, as identified by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514, 530–33, 92 S.Ct. 2182, 2191–93, 33 L.Ed.2d 101 (1972): the length of the delay, the reasons for the delay, the defendant's assertion of his right, and the prejudice to the defendant arising out of the delay.

### A. *Length of the Delay*

The *Barker* analysis is necessary, however, only when the length of the delay is "'so presumptively prejudicial as to warrant consideration'" of the three remaining factors in the balancing process. *State v.*

*Murphy,* 496 A.2d at 627 (quoting *State v. Dudley,* 433 A.2d 711, 713 (Me.1981)). The length of the pretrial delay here, measured from the day of indictment or actual restraint imposed by arrest to the opening day of trial, was just over fourteen months. Such a delay is sufficient to trigger the plenary *Barker* analysis. *See State v. Cadman,* 476 A.2d at 1151. As a factor to be weighed, however, it is not chargeable against the State, particularly in a complex murder case involving co-defendants. *Cf. State v. Murphy,* 496 A.2d at 627 (25-month, 3 week delay not "unusually egregious"); *State v. Cadman,* 476 A.2d at 1152 (1-year delay in a gross sexual misconduct case not excessive or helpful to defendant in balancing process).

### B. *Reasons for the Delay*

The defendant challenges only the trial court's granting of the State's motion to continue, alleging that the delay was unnecessary because the family-privilege issue being appealed by Robert, Rita, and Stacie Willoughby was not "fairly litigable." At the hearing on the Willoughbys' motions to quash their subpoenas, the court ruled that a family privilege precluding family members from testifying against Philip did not exist. He therefore denied their motions, and found each of them in contempt for failing to answer questions when the court directed them to do so. When they immediately filed notices of appeal to the Law Court, the State moved to continue the trial pending disposition of the appeals. Over the defendant's objection, the court granted the continuance on the ground that the Willoughbys' testimony "could be significant at trial."

The defendant's reliance upon *State v. Fernald,* 397 A.2d 194 (Me.1974) in arguing that the issues the Willoughbys sought to have resolved were not "fairly litigable" is misplaced. In *Fernald,* we held that the time consumed by the prosecution's interlocutory appeal of the denial of a search warrant was not chargeable against the State, and noted that the issue was "fairly litigable," even though the outcome was unfavorable to the State in that the appeal was dismissed for lack of jurisdiction in the Law Court. *Id.* at 196; *see State v. Fernald,* 381 A.2d 282 (Me.1978). We dismissed the Willoughbys' appeal for similar reasons, holding that there was no practice that allowed a witness to obtain a ruling on confidentiality through an interlocutory appeal prior to trial. *In re Willoughby,* 487 A.2d at 638. As in *Fernald,* there is nothing in the case before us to suggest that either the appeal or the motion for continuance was a bad-faith tactic of the prosecution to impair the defendant's right to a speedy trial. Moreover, we are unable to say that the law in Maine prior to *In re Willoughby* was so clear as to preclude an attempt to resolve the family-privilege issue prior to trial through an appeal of the denial of the motions to quash and of the judgments of contempt. *See* I Cluchey & Seitzinger, *Maine Criminal Practice* § 17.7, at 17–12 n. 29 (1985).

The defendant further contends that the Willoughbys would have continued to be unavailable as witnesses regardless of the decision on appeal. A party seeking a continuance for the purpose of securing the attendance of witnesses must show that the witness can probably be obtained if the continuance is granted. *State v. Curtis,* 295 A.2d 252, 255 (Me.1972); *see also State v. Reed,* 479 A.2d 1291, 1295 (Me.1984); *State v. Carey,* 303 A.2d 446, 449 (Me.1973). Here, the fact that the Willoughbys' attorney stated that he had a "feeling" there was a "real possibility" they might continue to refuse to testify regardless of the decision on appeal does not establish their continuing unavailability. The State clearly believed that the Willoughbys would indeed be available to present what it considered essential evidence if their appeals were denied, based particularly on Robert Willoughby's prior willingness to testify before the Grand Jury after the court there ruled on the privilege question. We therefore find the

defendant's argument that the delay was unnecessary to be without merit.

### C. Defendant's Assertion of his Right

The State concedes, as it must, that this factor weighs in the defendant's favor since he timely and consistently asserted his right to a speedy trial when the trial court granted the State's motion for continuance.

### D. Prejudice to the Defendant

We have evaluated any prejudice to an accused in light of the following three interests that the speedy trial right is designed to protect: 1) to prevent undue and oppressive incarceration prior to trial; 2) to minimize anxiety and concern to the accused accompanying public accusation; and 3) to limit the possibility the defense will be impaired. *State v. Fernald,* 397 A.2d at 196 (*quoting United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966)).

The additional period of incarceration occasioned by the appeal here, as in *Fernald,* was not rendered "undue or oppressive" in the sense that it was unnecessarily caused by the State and does not in itself warrant dismissal absent actual prejudice to the defendant. The defendant concedes that the defense was not impaired in any "obvious way" since no witnesses became unavailable. His general claim of "additional memory lapse" is purely speculative and therefore will not be favorably considered. *See State v. Cadman,* 476 A.2d at 1151. His claim that some of the inmates at the jail "had it in their mind to 'get' " him similarly does not constitute actual prejudice. It is further "not within the scope of the constitutional guarantee of speedy trial to protect against" the creation of new evidence against the defendant, such as that supplied by the jail inmates. *State v. Fernald,* 397 A.2d at 197.

On balance, the length of the pretrial delay was not unjustifiably long, particularly in view of the "time and effort that both the defense and prosecution ordinarily require to prepare for the trial of a complicated murder case." *State v. Goodall,* 407 A.2d 268, 280–81 (Me.1979). Even assuming that the delay caused by the State's motion to continue is chargeable against the State, the defendant suffered no actual prejudice from it. We accordingly conclude that the defendant's constitutional right to a speedy trial was not violated.

### III. The Quashing of the Subpoena to Testify

We turn now to the defendant's contention that the trial justice deprived him of his constitutional right to compel the attendance of witnesses by quashing the subpoena ad testificandum for the prosecutor in the earlier trial of David Willoughby. We agree that the justice erred in quashing the subpoena but reject the defendant's contention that his constitutional right to compulsory process was infringed; therefore, we find the error to be harmless.

Near the end of David Willoughby's trial, the prosecutor indicated that he did not plan to call David as a witness in his stepbrother's trial because he was not going to make use of what he felt would be perjured testimony. After a new chief prosecutor was appointed just prior to the Philip Willoughby trial, counsel for Philip subpoenaed the original prosecutor for the purpose of having him testify to impeach David in the event the State called David as a witness. The prosecution immediately filed a motion to quash the subpoena pursuant to Rule 17 of the Maine Rules of Criminal Procedure. After a hearing, the justice quashed the subpoena on the ground that the prosecutor's opinion of David's character for truthfulness would be inadmissible under Rule 405 of the Maine Rules of Evidence.

We note initially that Rule 17 provides no procedure for the quashing of a subpoena ad testificandum on the grounds that the testimony sought might be inad-

missible.[3] Rule 17 sets forth guidelines only for the quashing of a subpoena duces tecum, similar to those in its federal counterpart that are in part intended to protect against unreasonable search and seizure. *See* 8 J. Moore, *Moore's Federal Practice* § 17.07, at 17–22 (1985). As we stated in *State v. Nichols*, 325 A.2d 28, 32 (Me.1974), there is no language in Rule 17 that allows a justice to order a pretrial hearing "to permit the State to learn what testimony a witness would give if presented at trial." [4] We expressed therein our disapproval of any attempt by the State to compel the pretrial production of evidence by a defendant. If the State were permitted a hearing on its motion to quash a subpoena to testify, a defendant would be compelled to reveal information about his defense in order to secure the attendance of a witness. This approach was rejected when the drafters of Rule 17 dispensed with the prior federal practice of requiring that an indigent defendant file an affidavit in support of a request for the issuance of a subpoena. *See* Rule 17 reporter's notes, *reprinted in* Cluchey & Seitzinger, at 17–3.[5]

Absent such disclosure by the defendant, the court may not prematurely determine that a potential defense witness will not be allowed to testify where that determination is based on speculation by the prosecution or the court regarding the nature and content of the witness's anticipated testimony.

Such a decision to quash a subpoena, predicated on assumptions as to the nature of some portion of the witness's testimony, would deprive a defendant of the means or opportunity to adduce admissible evidence in other areas of inquiry.[6]

We recognize that other jurisdictions permit the quashing of a subpoena ad testificandum. *See, e.g., United States v. Kember*, 648 F.2d 1354 (D.C.Cir.1980); *United States v. Pitts*, 569 F.2d 343 (5th Cir.1978); *People v. Dunigan*, 96 Ill.App.3d 799, 52 Ill.Dec. 427, 421 N.E.2d 1319 (1981); *People v. Crown*, 75 Mich.App. 206, 254 N.W.2d 843 (1977). However, the better practice is to require the witness to appear and claim any privilege or immunity he may have or raise an objection to particular questions put to him. *See* 8 J. Moore at 17–18; 2 C. Wright, *Federal Practice and Procedure:* Criminal 2d § 273 (1982). Moreover, some of these courts authorize quashing of a subpoena requested by an indigent defendant where relevancy of the witness's testimony is not shown in accordance with the relevancy standard set forth in Rule 17(b) of the Federal Rules of Criminal Procedure. *See, e.g., United States v. Pitts*, 569 F.2d at 349 n. 10. Maine Rule 17(b), however, no longer requires an indigent defendant to show necessity for an adequate defense before the State will pay the costs of a subpoena for an in-state witness. M.R.Crim.P. 17 advisory commit-

3. Rule 17 provides that the court on motion may quash or modify a subpoena duces tecum if compliance would be unreasonable, oppressive, or in violation of constitutional rights.

4. Here, as in *In re Willoughby*, 487 A.2d at 638 n. 2, we need not decide whether the addition of Rule 12(c) of the Maine Rules of Criminal Procedure allowing motions in limine changed the rule in *Nichols* because the State did not seek a ruling in limine on the admissibility of any portion of the prosecutor's potential testimony.

5. We are aware that Cluchey & Seitzinger § 17.7, at 17–12 suggest that permitting a challenge to a subpoena to testify in the form of a motion to quash would avoid subsequent disruption of a trial. However, when the procedural rules do not provide such a mechanism, we find the risks inherent in compelling a defendant to reveal information to secure a wit-

ness outweigh the benefits of expediency. We further note that the procedure suggested by Cluchey & Seitzinger at 17–12 n. 29 and adopted by the parties in *In re Willoughby*, 487 A.2d at 638, was found to be without support in Maine law.

6. We limit our decision to the quashing of a subpoena ad testificandum that is based on the anticipated inadmissibility of the potential witness's testimony and do not decide whether other grounds would support such action. *See, e.g., United States v. Sims*, 637 F.2d 625, 629 (9th Cir.1980) (dictum) (trial court's refusal to issue subpoena appropriate where requested subpoena would constitute an oppressive and unreasonable use of the process of the court); *Amsler v. United States*, 381 F.2d 37, 51 (9th Cir.1967).

tee's note to 1979 amend., Cluchey & Seitzinger at 17–4 to 5. Therefore, the cases in which one alternative result of such a balancing test permits the quashing of a subpoena for a defense witness do not persuade us of the validity of that procedure in this case.

■ Nevertheless, we conclude that the court below did not deprive the defendant of his constitutional right to compulsory process by quashing the subpoena. The Sixth Amendment of the United States Constitution and Article I, section 6 of the Maine Constitution guarantee to a defendant in a criminal prosecution, the right "to have compulsory process for obtaining witnesses in his favor." However, the United States Supreme Court has held that "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses," but only the right to obtain those "in his favor." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). To show a violation of his constitutional right, the defendant must demonstrate how the testimony would have been both material and favorable to his defense. *Id.; see also Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *State v. Rabe*, 687 P.2d 554, 563 (Hawaii Ct.App.1984) (no constitutional violation unless witness denied to defendant could have produced testimony both material and favorable to defendant).

A review of the record reveals no showing by the defendant that the testimony sought from the prosecutor would have satisfied the *Valenzuela-Bernal* test. He contends on appeal only that the former prosecutor should have been allowed to testify as to his opinion of David's truthfulness, testimony that clearly would not be admissible under Rule 405 of the Maine Rules of Evidence because it is not evidence of reputation. *See State v. Arnold*, 421 A.2d at 938. The defendant was therefore not deprived of his constitutional right to compulsory process by the quashing of

the subpoena. *See Commonwealth v. Blaikie*, 375 Mass. 601, 378 N.E.2d 1361, (1978) (defendant not denied constitutional right to compulsory process by court's denial of right to call prosecutor whose expected testimony had no impeachment value); *see also Darby v. State*, 47 Md.App. 1, 421 A.2d 108 (1980) (defendant's constitutional right to compulsory process not infringed by denial of writs of habeas corpus ad testificandum when witnesses incompetent to testify even though Maryland rule does not require showing of necessity before right to process attaches).

In the case before the court, the defendant has not demonstrated that the prosecutor would have furnished admissible testimony if called as a witness. It is undisputed that both the State and the defendant made the court aware that the prosecutor's testimony would have consisted solely of his opinion regarding David Willoughby's credibility, and that he would have been called for the purpose of eliciting that opinion and nothing more. Because that opinion is inadmissible, M.R.Evid. 405, the defendant in these circumstances was not deprived of the opportunity to adduce admissible testimony from this witness. We therefore conclude that because it is highly probable that the quashing of the subpoena did not affect the judgment, it was harmless error. *See State v. Reeves*, 499 A.2d at 137; *State v. True*, 438 A.2d at 467.

## IV. *The Prosecutor's Representation*

■ The defendant asserts that the prosecutor intentionally misrepresented to the Superior Court that David Willoughby's testimony concerning the date and manner of disposition of lottery tickets stolen from Summer Haven Ice Cream, Inc. would be corroborated by the testimony of his brother-in-law, John Glidden. He further contends that this allegedly intentional misrepresentation to the court resulted in the trial justice's reversal of his earlier ruling excluding the testimony of David Willoughby, thereby depriving the defendant of a fair trial. We disagree.

We first note that the defendant did not preserve any claim of error for appeal. At no point did counsel for the defendant, who was in possession of a statement made by Glidden concerning the disposition of the tickets, dispute the prosecutor's representation of the contents of the statement. Furthermore, the defendant has failed to include a copy of Glidden's statement in this record on appeal. We therefore review only for obvious error, which we have defined as one that was " 'so highly prejudicial and so taint[ed] the proceeding as virtually to deprive the aggrieved party of a fair trial.' " *State v. Reeves*, 499 A.2d at 136 (quoting *State v. True*, 438 A.2d at 468).

Two clear principles are involved in the analysis of this issue. First, a lawyer must not knowingly make a false statement or conceal information legally required to be revealed. M. Bar R. 3.7(b). Second, the State has an obligation to ensure a fair trial. *State v. Hinds*, 485 A.2d 231, 235 (Me.1984). The prosecutor here told the justice that David Willoughby's testimony about the disposition of the lottery tickets "may vary in some small detail but [is] basically consistent with what Mr. Glidden is to testify about." A comparison of Willoughby's testimony with the subsequent trial testimony of Glidden reveals that, according to both, the lottery tickets were disposed of in Brunswick, where they drove in Glidden's car. Their accounts only differ as to the date on which the drive to Brunswick occurred. We agree with the State that the difference of one day constitutes a variation "in some small detail," and that David's testimony and Glidden's were basically consistent. Accordingly, we find no merit to the defendant's argument that the prosecutor misrepresented Glidden's testimony.

### V. *The Testimony of David Willoughby*

The defendant finally contends that the prosecutor deliberately deceived the court by knowingly soliciting and presenting David Willoughby's allegedly perjured testimony. It is clear that the prosecutor did not deliberately deceive the court, because at the outset of the trial, he outlined for the presiding justice three areas in which he believed David's testimony to be false and impeachable. Therefore, *Board of Bar Overseers v. Dineen*, 481 A.2d 499 (Me.1984) can immediately be distinguished because the prosecutor here did inform the court of the falsity of the potential witness's testimony. The question remains whether he subsequently solicited or presented false testimony that in reasonable likelihood could have affected the judgment of the jury. *See State v. Brunette*, 501 A.2d 419, 423 (Me.1985).

The three areas initially outlined were: 1) the events of December 4; 2) the disposition of the lottery tickets; and 3) David's viewing of the victim's body. A hearing was held following the initial conference wherein defense counsel attempted to show that David's testimony was false. The presiding justice concluded that, based on the evidence adduced at the hearing, "I cannot now determine that the State is aware or should be aware that Mr. Willoughby's testimony or part of it are going to be false." He further found that David was not an inherently incredible witness, and that his testimony was not so obviously false as to require exclusion on ethical grounds.

A careful review of David's testimony, both at the hearing before the trial justice and before the jury, and of the prosecutor's representations supports the court's findings. David testified that on December 4, after he cleaned up what looked like blood in his mother's car, his fiancee arrived. They then went to purchase an engagement ring. On December 5, he went to find the body about which Philip had allegedly told him, and viewed it from a distance of fifteen to twenty feet. On December 6, he and John Glidden went to Brunswick in Glidden's car to cash the lottery tickets. His testimony before the jury was the same as that on voir dire.

As a result of David's voir dire testimony, the prosecutor informed the court that David was no longer impeachable as to the events of December 4. David had apparently testified previously that other than cleaning the car and driving his mother to work, he had stayed home that day. However, he had since recalled the purchase of the engagement ring. As we found above, David's testimony about the disposition of the lottery tickets was essentially corroborated by John Glidden's similar account. Therefore, the prosecutor's representations, taken together with David's testimony, support the trial justice's finding that the prosecutor was no longer taking the position that at least two of the areas of testimony would be subject to impeachment. Finally, we agree with the prosecutor's and the justice's characterization of the discrepancy with respect to the distance from the body as a legitimate difference of perception that did not rise to the level of perjury. A review of David's testimony further supports the court's finding that it was not so incredible or false as to require exclusion.

Unlike the situation in *State v. Brunette*, 501 A.2d at 522, where the court was unequivocally informed that a witness had testified falsely, the facts here do not demonstrate that untruthful testimony was presented to the jury. Although a prosecutor may not state his opinion regarding the credibility of a potential witness, *see* M. Bar R. 3.7(e)(2)(v), that unsubstantiated opinion, offered in the heat of trial, does not in and of itself constitute knowledge that the witness will commit perjury.[7] Accordingly, the defendant's argument that the prosecutor knowingly solicited and presented perjured testimony is without merit.

The entry is:

Judgment affirmed.

All concurring.

[7]. We observe that statements by one member of a prosecutorial office are attributable to the State. *Giglio v. United States*, 405 U.S. 150, 154,

92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972); *State v. Borucki*, 505 A.2d 89, 93 (Me.1986).